[No. B148904. Second Dist., Div. Three. Sept. 5, 2002.]

ST. PAUL FIRE AND MARINE INSURANCE COMPANY et al., Plaintiffs and Respondents, v.
AMERICAN DYNASTY SURPLUS LINES INSURANCE COMPANY et al., Defendants;
SASCO ELECTRIC, Defendant and Appellant.

1040

## COUNSEL

The Claypool Law Firm and Brian E. Claypool for Defendant and Appellant.

Neumeyer & Boyd, Carol Boyd and Larry Nathenson for Plaintiffs and Respondents.

## OPINION

**CROSKEY, J.**—In this case, we are asked to address the question of the proper meaning and construction to be given to the language of causation utilized in a policy of liability insurance and in a related contract of indemnity. We are asked to determine and apply the meaning of the phrases "resulting from," "arising from" and "arising out of" in the context of a limitation to (1) the "acts or omissions" of the indemnitor and (2) the "liability" exposure of the indemnitee. Upon that determination depends the liability of the appellant subcontractor under a contract of indemnity given to a general contractor for an injury sustained by one of the subcontractor's employees. In the subcontract, the subcontractor promised to indemnify the general contractor from any liability for damages attributable to bodily injury (including for attorney's fees) that arose from, in whole or in part, "*any act or omission*" of the subcontractor. In addition, the subcontractor promised to add the general contractor to its liability policy as an "additional insured," but such coverage would only extend to "*liability* arising out of" the subcontractor's ongoing operations for the general contractor.

Sasco Electric (Sasco), the defendant and appellant, seeks reversal of a judgment for $113,383.05, entered jointly and severally against it and its liability insurer, American Dynasty Surplus Lines Insurance Company (American Dynasty), as well as the trial court's postjudgment order requiring Sasco to pay attorney's fees and costs. The plaintiffs and respondents are ARB, Inc. (ARB), the general contractor, and St. Paul Fire and Marine Insurance Company (St. Paul), ARB's liability insurer that had provided it with defense and indemnity coverage for a claim that allegedly came within Sasco's promise of indemnity.

The undisputed facts demonstrate that no "act or omission" of Sasco caused the injury to its employee, but rather such injury resulted entirely from activities of ARB that were *unrelated* to the work called for in the subcontract executed between Sasco and ARB. The "mere presence" on the jobsite of a Sasco employee is not sufficient to constitute an act or omission on Sasco's part. In such circumstances, the "liability" of ARB, covered by the additional insured endorsement in the policy issued by American Dynasty, did not arise from Sasco's "ongoing operations." As a result, we conclude that (1) Sasco's promise of contractual indemnity did not embrace the liability claim for which ARB and St. Paul sought indemnity, and (2) there was no potential for coverage under the American Dynasty policy for the injured employee's claim against ARB. We therefore reverse both the judgment and the postjudgment order.

## Factual and Procedural Background[1]

Given that the parties executed and submitted to the court, prior to trial, a written stipulation as to the relevant facts, we recite those facts as reflected in the stipulation with but minor editorial modification for purposes of simplicity and clarity.

ARB is a licensed contractor that entered into a construction contract with the Atchison, Topeka & Santa Fe Railroad Company (ATSF) to perform construction work at the Santa Fe Locomotive Service & Rail Maintenance Yard in the City of Commerce (Maintenance Yard). ATSF owned the physical premises where the construction work was to be performed.

In December of 1996, ARB and Sasco entered into a subcontract (Subcontract) under which Sasco was to perform certain electrical work at the Maintenance Yard. That agreement, in article 5.1, required Sasco to add ARB as an additional insured to Sasco's liability policy with American Dynasty.[2] Effective May 1, 1997, defendant American Dynasty provided a policy of general liability insurance to Sasco. Sasco caused ARB to be added to that policy as an additional insured, but, according to the endorsement issued by American Dynasty, the policy provided coverage to ARB "only with respect to *liability* arising out of [Sasco's] ongoing operations performed for [ARB]." (Italics added.) Prior to the accident that led to this litigation, Sasco provided to ARB a certificate of insurance, together with a

---

[1] The facts we recite are not in dispute. They are established by a written stipulation executed between the parties and upon which the trial of this matter was conducted. With respect to the procedural history of this case, we rely upon the papers, pleadings and other documents submitted to us in the appellate record.

[2] Article 5.1 provided, in relevant part, as follows: "Subcontractor, at its own expense, shall obtain and maintain in full force at all times until the work covered by the Prime Contract is completed, insurance coverage from companies acceptable to Contractor to fully protect Subcontractor, Contractor and Owner/Prime Contractor from claims set forth below which *may arise out of or result from Subcontractor's operations under this Agreement,* whether such operations be by Subcontractor or by any lower tier subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable, including . . . (b) claims for damages because of bodily injury, occupational sickness or disease, or death of Subcontractor's employees; . . . . Contractor, Owner/Prime Contractor and all others specified in the Contract Documents shall be named as additional insureds as to all Subcontractor's operations and policies under this Agreement. The maintenance of said insurance shall be a condition precedent to Subcontractor's right to payment under Article 7. Subcontractor's insurance policies shall contain a waiver of subrogation against Contractor, Owner/Prime Contractor, separate contractors or agents and employees of either and shall be issued by an insurance company with a Best's rating of 'A' or better. Subcontractor's insurance shall be primary and non-contributory with Contractor's insurance." (Italics added.)

copy of the additional insured endorsement. *ARB did not object to the language of the additional insured endorsement.*[3]

The Subcontract also provided in article 4.1: "To the fullest extent permitted by law, *Subcontractor [Sasco] agrees to indemnify and hold Contractor [ARB] and Owner/Prime Contractor [ATSF], their agents, members, directors, officers and employees, harmless from any and all* demands, liability, judgments, liens, claims, damages (including direct, liquidated, consequential, incidental, economic or other damages), awards, losses (including economic losses), penalties, fines, assessments, liabilities, interest, costs and expenses, including attorneys' fees (hereinafter collectively referred to as 'Claim' or 'Claims') *arising out of or resulting from the performance of the Work, either directly or indirectly, provided* that any such Claim (a) *is attributable to bodily injury,* sickness, disease or death to persons (*specifically including Subcontractor's employees*), or to injury or destruction of property including the loss of use therefrom, *and* (b) *arises from or is alleged to have arisen in whole or in part by any act or omission of Subcontractor or any subcontractor under him, or their servants, agents or employees (specifically including the acts or omissions of the injured party(ies)), even in the event that it is contributed to by the active or passive negligence or misconduct of a party indemnified by this Agreement.*" (Italics added.)[4]

ARB was a named insured under its own general liability policy issued by St. Paul. That policy carried a $100,000 deductible. ATSF was an additional insured under the St. Paul policy. ATSF merged with Burlington Northern Railroad Company and became the Burlington Northern Santa Fe Railroad Company (BNSF). The coverage provided by St. Paul to ATSF also applied to BNSF.

---

[3]However, an examination of that endorsement reflects that it said nothing about the $10,000 self-insured retention in the American Dynasty policy. This fact is relevant to ARB's claim, discussed below, that Sasco breached the Subcontract when it failed to provide ARB with liability coverage that was both "primary and non-contributory" to ARB's own liability insurance.

[4]In addition, article 22.1 of the Subcontract contained the following attorney's fee clause: "*In the event the parties become involved in litigation or arbitration with each other arising out of this Agreement* in which the services of an attorney or other expert are required, *the prevailing party shall be fully compensated for the cost of its participation in such proceedings, including all costs, expenses (including experts' fees) and attorneys' fees.* Unless judgment goes by default, the attorneys' fee award shall not be computed in accordance with any court schedule, but shall be such as *to fully reimburse all attorneys' fees actually incurred in good faith, regardless of the size of a judgment,* it being the intention of the parties to fully compensate for all attorneys' fees and experts' fees paid or incurred in good faith." (Italics added.)

On August 25, 1997, Leo Casados (Casados), an employee of Sasco, was working on feeding electrical lines through a conduit pursuant to the Subcontract. While Casados was working, ARB was pressure-testing a pipe connected to a fuel tank. Neither Sasco nor Casados was ever involved in pressure-testing the pipe, nor did the Subcontract call for it. ARB's work and Casados's work went on independently of each other, and neither was aware of the other's presence at the time the pipe was pressurized. During ARB's pressure-testing, a portion of the pipe exploded causing metallic fragments to strike Casados resulting in his injury. Prior to the explosion, Casados heard a hissing noise, which frightened him and caused him to begin to run from his work site to a point where he was struck by a fragment in his leg. The explosion occurred within five seconds from when Casados first heard the hissing noise. Neither Sasco's nor Casados's conduct caused, or in any way contributed to, the bursting of the pipe.

On June 19, 1998, Casados filed a lawsuit in the superior court in Los Angeles County, case No. BC193049, entitled *Leo Casados v. ARB* (Casados lawsuit). Casados named ARB, BNSF, and certain other parties as defendants, alleging negligence and strict liability.[5]

ARB and BNSF tendered defense of the Casados lawsuit to St. Paul, claiming coverage under the St. Paul policy. St. Paul in turn tendered defense of the Casados claim to American Dynasty, contending that ARB and BNSF were covered for the Casados claim under the additional insured endorsement issued by American Dynasty.

American Dynasty denied coverage and refused a defense to ARB and BNSF, contending that the additional insured endorsement on the American Dynasty policy did not provide coverage to ARB or BNSF for the Casados claim. American Dynasty was aware of all the facts recited above at the time it denied coverage.

St. Paul went ahead and provided a defense to both ARB and BNSF in the Casados lawsuit. In providing that defense, St. Paul incurred $38,383.05 in costs and legal fees before it settled the case for $75,000 in August of 1999. Thus, St. Paul's total expense to resolve the Casados claim was $113,383.05. Because of the deductible provision in the St. Paul policy, ARB later reimbursed St. Paul for the sum of $100,000.

On July 31, 2000, St. Paul and ARB filed this action for breach of contract and declaratory relief, seeking to recover the $113,383.05 that had been

---

[5]Presumably, Sasco was not named as a defendant due to its status as Casados's employer. Casodos's claims, if any, against Sasco are apparently limited to those available under workers' compensation. (See Lab. Code, § 3602.)

expended to defend and settle the Casados litigation. Basing their claim on the provisions of the Subcontract and the additional insured endorsement to the American Dynasty policy, they alleged that these expenses were properly payable by Sasco and American Dynasty.

The case was tried to the court, sitting without a jury, on the stipulated facts set out above. The trial commenced and concluded on February 20, 2001, and the court orally announced its decision from the bench, finding in favor of ARB and St. Paul and granting them all of the relief they had requested.[6] In its statement of decision, issued contemporaneously with its judgment on April 2, 2001, the trial court essentially recited the facts as to which the parties had already stipulated. Judgment was awarded in favor of ARB and St. Paul in the total sum of $113,383.05, plus prejudgment interest from July 31, 2000. This award was made jointly and severally against Sasco and American Dynasty. In addition, the trial court ordered that Sasco pay to

---

[6]After accepting the parties' stipulation as to the facts and receiving in evidence the Subcontract, the American Dynasty policy, the additional insured endorsement and the Certificate of Insurance issued by American Dynasty to ARB, the trial court heard the oral argument of counsel. Upon its conclusion, the court answered, from the bench, *"yes"* to each of the following eight questions set out in the parties' joint list of issues to be determined at trial:

"1. Under the indemnity provision in Article 4 of the subcontract between ARB and Sasco Electric, was Sasco obligated to defend and indemnify ARB and BNSF (the owner of the premises where the accident occurred) for the injuries sustained by Sasco's employee Leo Casados on August 25, 1997?

"2. Did Sasco breach its obligation pursuant to Article 4 of the subcontract to defend and indemnify ARB and BNSF?

"3. Under the insurance provision in Article 5 of the subcontract between ARB and Sasco Electric, did Sasco breach its obligation to obtain liability insurance for ARB and BNSF as additional insureds, which would be primary to their own insurance? [The trial court's affirmative answer to this question was limited to the finding of a breach of the Subcontract by Sasco *only* as to the promise to provide "non-contributory" coverage for ARB.]

"4. Was American Dynasty Surplus Lines Insurance Company obligated, under its liability policy issued to Sasco Electric, and specifically under the endorsement for additional insureds as required by written contract, to defend and indemnify ARB and BNSF for the injuries sustained by Sasco's employee Leo Casados on August 25, 1997?

"5. Did American Dynasty breach its obligations under the insurance policy by failing to defend and indemnify ARB and BNSF in the lawsuit brought by Leo Casados?

"6. If any of such obligations were breached, are ARB and St. Paul entitled to recover the stipulated amounts of their defense costs ($38,383.05) and settlement ($75,000) incurred in the lawsuit brought by Leo Casados?

"7. Between Sasco on the one hand and ARB and St. Paul on the other, is the prevailing party entitled to their attorney's fees and costs for the prosecution of the present lawsuit under the attorney's fees provision in Article 22 of the subcontract between ARB and Sasco?

"8. If any of such obligations were breached, are ARB and St. Paul entitled to recover prejudgment interest on the settlement and defense costs as liquidated amounts recoverable upon a finding of liability on the part of the defendants?"

ARB and St. Paul their reasonable attorney's fees and costs (to be determined by a postjudgment motion under rule 870.2 of the Cal. Rules of Court) incurred in prosecuting this action. Following such postjudgment motion, Sasco was ordered to pay the additional sum of $27,780.48 in costs and attorney's fees.

Sasco has filed this timely appeal from both the judgment and the order.[7] American Dynasty has satisfied the judgment awarded by the trial court (i.e., $113,383.05, plus interest) and has not filed an appeal. Sasco's appeal is directed at the entire judgment, including the postjudgment award of attorney's fees.

## CONTENTION OF THE PARTIES

Sasco contends that it had no obligation to either defend or indemnify ARB or BNSF in the Casados lawsuit. Sasco argues that the language of article 4.1 of the Subcontract clearly limits its obligation to ARB (and therefore to BNSF) to liability imposed on ARB by reason of some "act or omission" of Sasco. Since, under the stipulated facts, the injuries to Casados did *not* "result" or "arise" from any act or omission of Sasco, then, as a matter of law, it was entitled to judgment. Whatever the merits of the claimed breach of the Subcontract by reason of Sasco's failure to provide ARB with a liability policy which did *not* contain a $10,000 self-insured retention, ARB cannot claim any damage, in any event, as there was no potential for coverage of the Casados lawsuit under the American Dynasty policy.

ARB and St. Paul vigorously dispute these arguments and contend that the phrases "arising out of" and "resulting from," as used in the Subcontract, have received the broadest possible construction in the decided cases and are uniformly held to be broader than the term "caused by." The phrases used in the Subcontract and in the policy of insurance issued by American Dynasty require only a minimal causal nexus with the event causing injury on which the Casados claim was based. ARB and St. Paul argue that Sasco's *mere*

---

[7]Sasco filed its notice of appeal on March 19, 2001, stating that it "hereby appeals from the judgment entered on February 20, 2001, . . ." In fact, the judgment was not actually signed and filed by the trial court until April 2, 2001. The trial court, however, did orally announce its decision at the conclusion of proceedings on February 20, 2001. Pursuant to California Rules of Court, rule 2(d)(2), we elect to treat Sasco's notice of appeal as having been filed immediately after entry of judgment. (See *Darling, Hall & Rae v. Kritt* (1999) 75 Cal.App.4th 1148, 1154, fn. 5 [89 Cal.Rptr.2d 676].) Given that the judgment as entered also ordered that ARB was entitled to recover attorney's fees, but left the amount thereof for determination by postjudgment order, we deem Sasco's notice of appeal to include such order as well. This is consistent with the briefing and argument of the parties.

*presence* at the jobsite *while performing the agreed work* is a sufficient nexus.

After a careful analysis of the stipulated facts and the relevant contractual language, we have concluded that ARB and St. Paul, as well as the trial court, have misconstrued and misapplied the causation language contained in the Subcontract and the American Dynasty policy. For the reasons discussed below, we will reverse the judgment and the subsequent order awarding attorney's fees.

DISCUSSION

1. *Standard of Review*

■ As the facts relevant to the resolution of this matter have been agreed to by the parties, and therefore are undisputed, the issue before us as to the proper meaning and interpretation of contractual and liability policy terms is one of law that we decide de novo. (*Continental Heller Corp. v. Amtech Mechanical Services, Inc.* (1997) 53 Cal.App.4th 500, 504 [61 Cal.Rptr.2d 668] (*Continental Heller*).)

As a review of the trial court's affirmative answers to each of the parties' joint list of issues demonstrates, it decided only legal issues, not factual ones. Moreover, its legal conclusions as to the meaning to be given to provisions of the Subcontract and the American Dynasty policy were entirely based on undisputed and agreed facts with no extrinsic evidence received. As a result, we are not bound by the trial court's conclusions and are free to make our interpretation and construction of those instruments and decide the issues anew. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839]; *Diamond Benefits Life Ins. Co. v. Troll* (1998) 66 Cal.App.4th 1, 5 [77 Cal.Rptr.2d 581].)

■ Indemnity agreements and policies of insurance are construed under the same rules that govern the interpretation of other contracts. (*Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 969 [17 Cal.Rptr.2d 242].) Accordingly, both the Subcontract and the relevant language of the American Dynasty policy must be interpreted so as to give effect to the mutual intention of the parties. (Civ. Code, § 1636.) Such intention of the parties is to be ascertained from the "clear and explicit" language of the contract. (Civ. Code, §§ 1638-1639.) And, unless given some special meaning by the parties, the words of a contract are to be understood in their "ordinary and popular sense." (Civ. Code, § 1644.) "In interpreting an express indemnity agreement, the courts look first to the

words of the contract to determine the intended scope of the . . . agreement." (*Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1737 [286 Cal.Rptr. 435].) In addition, as we explain below, the additional insured endorsement in the American Dynasty policy was subject to two or more reasonable interpretations. Therefore, the rules applicable to resolving ambiguity in insurance policy provisions will control.[8]

### 2. The Subcontract Did Not Require Sasco to Provide a Defense to ARB

"[T]he question whether an indemnity agreement covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control. When the parties knowingly bargain for the protection at issue, the protection should be afforded. This requires an inquiry into the circumstances of the damage or injury and the language of the contract; of necessity, each case will turn on its own facts." (*Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622, 633 [119 Cal.Rptr. 449, 532 P.2d 97].)

In the Subcontract, Sasco's indemnification obligation is both explicit and clear. Sasco promised to hold ARB "harmless from any and all . . . liability [attributable to bodily injury] . . . arising out of or resulting from the performance of the [work that was the subject of the subcontract], either directly or indirectly, . . . [*provided that such liability*] arises from or is alleged to have arisen in whole or in part *by any act or omission of Subcontractor* or any subcontractor under him, or their servants, agents or employees (specifically including the acts or omissions of the injured party(ies)), even in the event that it is contributed to by the active or passive negligence or misconduct of a party indemnified by this Agreement." (Italics added.)

Although acknowledging the existence of this conditional contractual language, ARB, throughout its brief, fails to give it any legal significance. Neither, for that matter, did the trial court. ARB argues that this language should be read as entitling it to indemnification even if the injury arose *solely* from its own active negligence "*so long as the injury has some connection to work performed under the contract.*" (Italics added.) This argument effectively rewrites the subcontract by placing *all* of the emphasis on Sasco's commitment to indemnify ARB for all liability "arising out of" or "resulting from" the work to be performed. It thus totally ignores the express

---

[8]We discuss these additional rules in detail below in our consideration of the question of coverage under the American Dynasty policy.

unambiguous condition quoted above. This appears to us to be disingenuous in light of ARB's stipulation that the injury to Casados *did not arise from any act or omission by Sasco.*

ARB's contention seems to be that Sasco's act of showing up on the BNSF premises and performing work under the Subcontract, even though such work admittedly had nothing to do with the events that led to the injury to Casados, is in and of itself sufficient to trigger the promise of indemnification. In other words, ARB argues that the *"mere presence"* of Sasco employees on the job site, while engaged in performance of the work called for under the Subcontract, is a sufficient "act or omission" by Sasco to trigger the indemnity clause of article 4.1. This, in our view, goes too far. (See, e.g., *Hartford v. State of California* (1996) 41 Cal.App.4th 1564, 1569-1570 [49 Cal.Rptr.2d 282].) This argument not only defies common sense and a fair reading of the indemnification commitment, it is not supported by the case authority relied upon.

ARB cites *Fireman's Fund Ins. Cos. v. Atlantic Richfield Co.* (2001) 94 Cal.App.4th 842 [115 Cal.Rptr.2d 26] (*Fireman's Fund*) and *Acceptance Ins. Co. v. Syufy Enterprises, Inc.* (1999) 69 Cal.App.4th 321 [81 Cal.Rptr.2d 557] (*Syufy*) as supportive of its argument. Those cases each provide a clear illustration of the consistently broad interpretation given by California courts to phrases such as "arising out of" or "arising from" and "resulting from." Both *Fireman's Fund* and *Syufy*, however, did so in the context of significantly different contractual language.

In *Fireman's Fund*, an employee of a construction company was injured in the course of work he was doing for an oil company at the oil company's plant. The injury arose from the collapse of a step owned and maintained by the oil company. When the employee sued the oil company, it sought a defense under the contractor's liability policy to which the oil company had been added as an additional insured. The endorsement provided that the oil company's entitlement to coverage under the policy was limited to "liability *arising out* of [the contractor's work] for [the oil company] . . . ." (Italics added.) Following resolution of the employee's claim, the insurer sued the oil company to recover its defense and settlement costs. The trial court granted the oil company's motion for summary judgment. (*Fireman's Fund, supra,* 94 Cal.App.4th at pp. 845-846.)

In affirming that judgment, the *Fireman's Fund* court held that the fact that the employee had been injured while performing work called for by the general contractor's agreement with the oil company was a sufficient causal

connection to trigger coverage under the contractor's policy. (*Fireman's Fund, supra,* 94 Cal.App.4th at p. 851.) The court rationalized its conclusion as follows. " 'California courts have consistently given a broad interpretation to the terms "arising out of" or "arising from" in various kinds of insurance provisions. It is settled that this language does not import any particular standard of causation or theory of liability into an insurance policy. Rather, it broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship. [Citations.]' " (*Id.* at p. 849, quoting *Syufy, supra,* 69 Cal.App.4th at p. 328.)

In *Syufy,* there was a similar fact situation. A contractor was performing work for Syufy, a building owner. The contractor's employee, who had been working on the building's roof, was injured while descending through a hatch that provided the only roof access. The employee sued Syufy, which sought and received a defense from the contractor's liability insurer pursuant to an additional insured endorsement added to the policy in accordance with the terms of the contractor's written agreement with Syufy. That endorsement provided that Syufy would be covered under the policy, "but only with respect to liability *arising out of* [the contractor's] work for [Syufy] [performed by or on behalf of the contractor]." (Italics added.) After the insurer settled the employee's suit, it sought contribution from Syufy because the defective hatch had caused the employee's injury. The trial court granted Syufy's motion for summary judgment and the Court of Appeal affirmed. (*Syufy, supra,* 69 Cal.App.4th at pp. 324-325.)

The *Syufy* court reviewed a number of California and out-of-state authorities and concluded that the broad construction of the phrases "arising out of" or "arising from" adopted by those authorities clearly reflects the law in this state (and nearly everywhere else). Applying this principle, the court stated, "Under this commonsense approach, [the employee's] injury clearly 'arose out of' the work he was performing on the roof of Syufy's building. The relationship between the defective hatch and the job was more than incidental, *in that [the employee] could not have done the job without passing through the hatch.* The fact that the defect was attributable to Syufy's negligence is irrelevant, since the policy language does not purport to allocate coverage according to fault." (*Syufy, supra,* 69 Cal.App.4th at pp. 328-329, italics added.)

Relying on these authorities,[9] ARB argues that, since Casados was injured while performing work called for in the Subcontract, a sufficient causal

---

[9]ARB also cited us to a number of other cases reaching the same result in their application of policy provisions similar to those found in *Fireman's Fund* and *Syufy,* but none of

relationship was thereby established triggering both Sasco's promise of indemnity as well as the "additional insured" endorsement in American Dynasty's policy. ARB concludes its argument by contending that "Under these authorities, the indemnity provision covers any claim against ARB that is *in some way* connected with the performance of work by Sasco under the subcontract, regardless of the specific theory of liability or causation. It does not matter whether Sasco was at fault. The fact that Leo Casados was injured while he was performing work for Sasco under the subcontract is sufficient to trigger the indemnity obligation. In fact, Casados's injury is more closely linked to the work than was the claim in the *Syufy* case, since Casados was actually performing work under the subcontract at the time he was injured, whereas the employee in *Syufy* was leaving the job site after completing his work." (Italics added.) We reject this argument.

There are at least two reasons why neither *Fireman's Fund* nor *Syufy* is helpful to ARB's argument. First, there is a significant factual distinction. In both of these cases, the subcontractor's employee was injured while performing some act directly related to the work called for by the subcontract. In other words, the employee was engaged in the activity called for under the subcontract or necessarily related thereto and it was the *performance* of *that activity* that led to the injury. More was involved than the employee's mere incidental presence in a "zone of danger" that had been created entirely by the actions of the general contractor and had *nothing* to do with the work called for in the subcontract. In *Fireman's Fund*, the employee was injured because of the failure of a step utilized by the employee while actually engaged in the work called for by the subcontract. In *Syufy*, the employee sustained his injury while exiting the jobsite through the only exit available to him.

Second, ARB's argument fails to come to terms with the stipulated fact that the language of the Subcontract contains an *express proviso* not contained in the additional insured endorsements in either *Fireman's Fund* or *Syufy* (or, for that matter, any of the other cases cited by ARB). Sasco expressly undertook no duty to indemnify ARB except for a liability that arose from an "act or omission" by Sasco *during the performance of the work called for by the Subcontract.*[10] Such language can have no other meaning or purpose than to limit the scope of Sasco's indemnity to injuries occurring in

those cases involved policies containing the express conditional limitations set forth in the Subcontract.

[10]Moreover, the language of article 4.1 compels the conclusion that Sasco would have no duty to indemnify ARB for any claim for damages attributable to bodily injury *solely* caused by the acts or negligence of ARB. First, Sasco's obligation was *expressly limited* to claims arising, *in whole or in part*, from its own act or omission. Second, Sasco's obligation would

circumstances over which it has at least *some* control and where it is engaged in activity that is causally related in some manner to the injury for which indemnity is claimed. As we have already emphasized, that precondition clearly did *not* occur here.

The case of *Continental Heller, supra,* 53 Cal.App.4th 500, is cited and relied upon by both parties. As we read that decision, however, it supports the conclusion that we reach. In that case, an explosion damaged a building owned by Oscar Meyer. Continental had been hired as the general contractor to work on the building and had subcontracted some of the work to Amtech. The explosion was caused by the failure of a valve previously installed by Amtech, but it was later determined that Amtech (which had not manufactured the valve) was not negligent or otherwise at fault. It simply had installed the faulty valve without knowing of its defect. Continental, after defending and settling the claims of the several Oscar Meyer employees who had been injured in the explosion, sued its subcontractor, Amtech, under the indemnity clause contained in the subcontract. That indemnity clause provided that Amtech would indemnify Continental for any loss "which arises out of or is in any way connected" with Amtech's "acts or omissions" in the performance of its work under the subcontract.

The *Continental Heller* court rejected Amtech's argument that such language required Continental to prove that the loss or liability arose due to some *legal fault* on the part of Amtech. (*Continental Heller, supra,* 53 Cal.App.4th at p. 505.) Since the explosion and the resulting liability most certainly "arose out of" or were "connected" with an act of Amtech's (i.e., the installation of the faulty valve), Amtech's duty to indemnify was triggered. (*Id.* at p. 506.) It was not necessary, given such contractual language, for Continental to prove that Amtech was legally at fault for the explosion. In language fully supportive of our own conclusion, the court stated, "Continental's entitlement to indemnity does not depend on a showing Amtech was at fault in performing its work on the refrigeration system. Rather, Amtech's duty to indemnify Continental applies 'to *any* acts or omissions . . . on the part of [Amtech]' not just to its 'willful misconduct or negligent conduct.' The language of the agreement leaves no doubt the parties intended Amtech should indemnify Continental irrespective of whether Continental's loss arose by reason of Amtech's negligence or for any other reason *except for the sole negligence or willful misconduct of Continental.*

exist even though ARB's active or passive negligence *contributed* to the injury (this implying that some other cause also contributed to such injury). Read together, these two qualifications to Sasco's indemnity obligation necessarily preclude its application where the *sole* cause of the injury was the act or negligent misconduct of ARB.

(See Civ. Code, § 2782.)[11]" (*Continental Heller Corp., supra*, 53 Cal.App.4th at p. 505, italics added.)

The reason that *Continental Heller* does not help ARB is that it clearly underscores two critical points relevant to our decision. First, the language of the indemnification contract will control the outcome. Second, where an indemnification promise is limited to "acts or omissions" of the promisor, there must be some evidence of such an act or omission, and there can be no indemnification obligation if the liability arose solely from the *negligence of the promisee or its agents.* (Civ. Code, § 2782; see also fn. 10, *ante.*)

On the record before us, not only is there no basis for finding Sasco at *fault* for Casados's injury, but also Sasco did *not* do *any* act that was in any way connected to such injury. There was no act or omission by Sasco: the injury to Casados resulted from an explosion in a pipe being pressure-tested *by ARB* and *its* employees or agents. Whatever negligence or legal responsibility there was for that explosion, it rests *solely* with ARB. To construe the promise of indemnity made by Sasco as applying merely because its employee was present within the zone of danger created *solely* by the negligence of ARB would offend not only the clearly expressed intent of the parties in article 4.1 of the Subcontract, but also the express prohibition set out in Civil Code section 2782. (See fns. 10 and 11, *ante.*)[12]

---

[11]Civil Code section 2782, subdivision (a), provides: "(a) Except as provided in Sections 2782.1, 2782.2, 2782.5, and 2782.6 [which exceptions are not relevant hereto], provisions, clauses, covenants, or agreements contained in, collateral to, or affecting any construction contract and which purport to indemnify the promisee against liability for damages for death or bodily injury to persons, injury to property, or any other loss, damage or expense *arising from the sole negligence or willful misconduct of the promisee or the promisee's agents, servants or independent contractors who are directly responsible to such promisee, or for defects in design furnished by such persons,* are against public policy and are void and unenforceable; provided, however, that this provision shall not affect the validity of any insurance contract, workers' compensation or agreement issued by an admitted insurer as defined by the Insurance Code." (Italics added.)

[12]This conclusion is entirely consistent with the recent decision in *National Union Fire Ins. Co. v. Nationwide Ins. Co.* (1999) 69 Cal.App.4th 709, 719 [82 Cal.Rptr.2d 16]. In that case, a subcontractor's employee was injured as a result of the general contractor's sole negligence. When the injured employee sued the general contractor, the general contractor sought a declaration that it was entitled to indemnification under a written indemnity agreement between it and the subcontractor, which provided that the subcontractor would indemnify it from any and all claims "arising out of or in any way connected with the performance of the subcontract work," including the active and passive negligence of the general contractor. However, the sole negligence or willful misconduct of the general contractor was specifically excepted from indemnification. (*Id.* at p. 717, fn. 1.) As we explained in footnote 10, *ante,* such a limiting provision, although not expressly included as in the *National Union* agreement, is necessarily implied in the Subcontract.

Therefore, Sasco's duty to indemnify ARB under the Subcontract was never triggered with respect to the claim made by Casados.

### 3. *There Was No Potential for Coverage Under the American Dynasty Policy*

While it is true that American Dynasty has not appealed from the trial court's judgment that concluded there was coverage for ARB under the American Dynasty policy, the issue of the existence of such coverage is still before us by virtue of Sasco's appeal. Sasco has standing to raise that issue as it is relevant to ARB's claim that Sasco breached the Subcontract by not providing "primary and *non-contributory*" liability insurance to ARB as promised in article 5.1 of the Subcontract. (Code Civ. Proc., § 902; *County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 736-737 [97 Cal.Rptr. 385, 488 P.2d 953].)

In addition to its promise to indemnify ARB, Sasco also promised, in article 5.1 of the Subcontract, to obtain and maintain a policy of liability insurance that was "primary and *non-contributory*" with ARB's liability policy, and which provided coverage to ARB as an "additional insured" for all claims "which may *arise out of or result from* [*Sasco's*] operations under [*the Subcontract*], whether such operations be by [Sasco] or by any lower tier subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable. . . ."

In accordance with this provision, Sasco caused ARB to be added as an additional insured by an endorsement to the American Dynasty policy. As already noted, however, that coverage was limited "to *liability* [to ARB] arising out of [Sasco's] ongoing operations performed for [ARB]."[13] The question that we must now address is whether this language actually provided any basis for coverage to ARB for the claim made by Sasco's employee, Casados. The answer to that question depends on the policy language and whether it is clear and unambiguous or subject to some ambiguity that must be resolved under settled principles.

In *National Union,* the trial court found that the general contractor was solely at fault, and that its negligence did not arise out of its supervision of the subcontractor's work. It therefore declared that the general contractor was not entitled to indemnification, and its judgment was affirmed on appeal.

[13]We pause to note and contrast the language of the additional insured endorsement in the *Continental Heller* case (where indemnification was promised for "*any loss* which arises out of or is in any way connected" with the indemnitor's "acts or omissions" (*Continental Heller, supra,* 53 Cal.App.4th at p. 508) to that utilized in American Dynasty's endorsement (where indemnification was limited "to *liability* arising out of [Sasco's] ongoing operations performed for [ARB]"). (Italics added.)

■ An insurance policy provision is ambiguous when it is capable of two or more constructions, both of which are *reasonable.* (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867 [21 Cal.Rptr.2d 691, 855 P.2d 1263].) The uncertainty may relate to the extent or existence of coverage, the peril insured against, the amount of liability or the party or parties protected. (See *Continental Cas. Co. v. Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 437-438 [296 P.2d 801, 57 A.L.R.2d 914] and cases cited there.) Such provision must be construed in the context of the policy as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265 [10 Cal.Rptr.2d 538, 833 P.2d 545] (*Bank of the West*).) The proper question is whether the particular phrase is ambiguous in "the context of *this* policy and the circumstance of *this* case." (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co., supra,* 5 Cal.4th 854, 868, italics in original.) This question must be answered through the eyes of a reasonable person in the position of the insured. (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 666-667 [42 Cal.Rptr.2d 324, 913 P.2d 878].) "Words used in an insurance policy are to be interpreted according to the plain meaning which a layman would ordinarily attach to them. Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764].)

■ There seems little question that, applying these principles, the language of the additional insured endorsement in the American Dynasty policy is susceptible of more than one reasonable interpretation as to the scope of coverage actually provided to ARB. (See, e.g., *Syufy, supra,* 69 Cal.App.4th at p. 326 [where the court accepted, arguendo, the ambiguity of such policy language].) Without any doubt, a reasonable layperson could interpret the language "arising out of [Sasco's] ongoing operations" as embracing either (1) any liability arising while Sasco was on the BNSF premises doing work under the Subcontract or (2) liability restricted to that arising, at least in part, from Sasco's actual performance of such work.

In order to resolve any ambiguity in the meaning of the additional insured endorsement, it would appear to be necessary to read its provisions together with, and in the context of, the Subcontract. The endorsement provides ARB coverage under Sasco's policy with American Dynasty because ARB is the "person or organization" which the written contract (here, the Subcontract) requires to be covered *"but only with respect to liability arising out of [Sasco's] ongoing operations performed for [ARB]."* Those ongoing operations are defined in the Subcontract itself, that is, the work to be performed

for ARB under the Subcontract. Thus, the language of the endorsement refers expressly to the Subcontract. Contrary to ARB's argument, it is irrelevant whether or not American Dynasty knew that ARB was the party covered under its endorsement. It was obviously aware that its named insured (i.e., Sasco) was adding to its policy a party to whom it had undertaken to provide such coverage under a written subcontract calling for performance of certain work on behalf of such other party. Clearly, the additional insured endorsement was issued in express contemplation of the obligations undertaken by Sasco under the Subcontract.

In addition to describing the work required to be performed, the Subcontract, under the provisions of article 5.1, required Sasco to obtain insurance to protect ARB "from claims set forth below which may arise out of or result from Subcontractor's operations under this Agreement. . . ." ARB argues that because article 5.1 does not include the additional limiting language of the "acts or omissions" of Sasco found in article 4.1, the insurance requirement is intended to be broader than the indemnity provision. However, we do not believe this argument has any merit. These two provisions are not exclusive of one another. Article 4.1 requires Sasco to indemnify ARB and sets forth the *extent* of that protection or coverage for all "claims arising out of or resulting from the performance of the work." Article 5.1 provides the *means* of doing so, that is, by purchasing insurance for that purpose. Thus, article 5.1 necessarily encompasses the more specific and narrower language of article 4.1. As a result, to properly construe the meaning of the additional insured endorsement, it is necessary to read it together with the relevant provisions of the Subcontract. (Civ. Code, § 1642.)[14] This conclusion, in our view, is fully supported by now settled principles of policy construction.

In *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807 [274 Cal.Rptr. 820, 799 P.2d 1253], the Supreme Court set forth the basic rules which must guide the interpretation of any policy of insurance. Those rules are based upon statutes dealing with the interpretation of contracts generally (*id.* at pp. 821-822), and are substantially identical to the rules already discussed that are applicable to all contracts. The Supreme Court amplified on these principles two years later in its decision in *Bank of the West, supra,* 2 Cal.4th 1254. ■ There, the court noted that "[w]hile insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. . . . The fundamental goal of contractual

---

[14]Civil Code section 1642 provides: "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."

interpretation is to give effect to the mutual intention of the parties. . . . If contractual language is clear and explicit, it governs. . . . On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' . . . This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, '*the objectively reasonable expectations of the insured.*' Only if this rule does not resolve the ambiguity do we then resolve it against the insurer. [¶] In summary, a court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy. . . . This is because '*language in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract.*' " (*Id.* at pp. 1264-1265, italics in original, citations omitted.)

The *Bank of the West* court made it clear that in order to conclude that an ambiguity exists which will be construed against an insurer, it is necessary first to determine whether the coverage under the policy, which would result from such a construction, is consistent with the insured's *objectively reasonable expectations.* In order to do this, the disputed policy language must be examined *in context* with regard to its intended function in the policy. (*Bank of the West, supra,* 2 Cal.4th at p. 1265; see also *Cooper Companies v. Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1106 [37 Cal.Rptr.2d 508].) This requires a consideration of the policy as a whole, the circumstances of the case in which the claim arises and "common sense." (*Bank of the West, supra,* 2 Cal.4th at pp. 1265, 1276.)

■ As we have concluded that an ambiguity is present, we must proceed to the second step of the analytical process outlined in *Bank of the West.* This requires us to consider not only the policy language, but also the circumstances of the case and apply a little common sense to determine which of the two reasonable interpretations of the additional insured endorsement meets the *objectively* reasonable expectations of ARB, the party claiming coverage under the endorsement. (*Bank of the West, supra,* 2 Cal.4th at pp. 1264-1265.)

The circumstances that clearly are significant are: (1) the stipulated facts as to how Casados sustained his injury; the explosion that caused the injury had *nothing* to do with Sasco's performance of the Subcontract but rather

resulted entirely from activities in which ARB was separately and independently engaged—Casados's presence nearby was *entirely incidental* to ARB's pressure-testing activity; and (2) the terms of the Subcontract relating to Sasco's indemnification promise and obligation to provide ARB with liability insurance: (a) article 4.1 *expressly* limited Sasco's promise of indemnity to liability arising from *its* acts or omissions and, as we have explained (see fn. 10, *ante*) necessarily excluded indemnification for claims arising *solely* from the acts or negligent misconduct of ARB, and (b) article 5.1 required liability coverage for ARB that covered claims arising only from claims that arose out of *Sasco's* "operations under [the Subcontract]."

When we examine these circumstances together, it is difficult to conclude that the endorsement's promise of coverage for ARB, made in accordance with the provisions of the Subcontract, was for anything other than such liability as might arise, at least in part, from the actual activities of Sasco in its performance of the work called for in the Subcontract. This conclusion is also compelled by simple common sense. The restriction to "ongoing operations," contained in both article 5.1 of the Subcontract and in the additional insured endorsement, when read in light of the limitations and qualifications on Sasco's own indemnity promise, compels the conclusion that the language of the additional insured endorsement could not reasonably be read as broader than Sasco's promise to indemnify.

Reading article 4.1 and article 5.1 together, along with the language of the additional insured endorsement (which, *by its own terms*, depended upon the existence of a written subcontract between Sasco and ARB, whether or not American Dynasty ever actually read such subcontract), ARB's objectively reasonable expectation of coverage under the American Dynasty policy could only be for claims against ARB that arose from some "act or omission" on the part of Sasco, even if some activity on the part of ARB contributed to the employee's injury. Put another way, the injury-causing act must somehow be related or connected to Sasco's performance of the work under the subcontract *beyond its mere presence on the jobsite*. It is not reasonable for ARB to expect that Sasco would indemnify ARB for any and all injuries that might result from any cause just because the injury occurred incidentally while Sasco was performing its duties under the contract.

We cannot conceive of how ARB could have had, *objectively or reasonably*, a contrary expectation. The liability coverage to be provided by Sasco could not reasonably be expected to be more expansive than Sasco's individual promise of indemnity. Such a commonsense reading of the endorsement language is also consistent with the general comment made in a recent

decision: "[the] 'well established meaning' of additional insured provisions [is that] '[t]hey are intended to protect parties who are not named insureds from exposure to *vicarious* liability for acts of the named insured.' [Citation.]" (*Maryland Casualty Co. v. Nationwide Ins. Co.* (1998) 65 Cal.App.4th 21, 31 [76 Cal.Rptr.2d 113], italics added.)

We therefore conclude that the "additional insured" endorsement in the American Dynasty policy must be interpreted as providing coverage to ARB only for *liability* arising, at least in part, from Sasco's activities in its performance of the subcontract, in other words, an "act or omission" by Sasco. As the stipulated and undisputed facts demonstrate that no act or omission of Sasco in the performance of the Subcontract played any part in any claim of *liability* arising from Casados's injury, there never was any potential for coverage under the American Dynasty policy.

That American Dynasty, for its own reasons, decided not to contest the trial court's contrary conclusion is of no consequence. Our determination as to the absence of coverage under the American Dynasty policy nonetheless has significance with respect to ARB's claim, also adopted by the trial court, that Sasco had breached the Subcontract by providing less than the promised insurance. We now turn to that issue.

4. *As ARB Had No Viable Claim to Coverage Under the American Dynasty Policy, It Sustained No Damage by Reason of Sasco's Alleged Breach of the Subcontract*

We assume, arguendo, that the inclusion of a $10,000 self-insured retention (SIR) provision in the American Dynasty policy constituted a breach of Sasco's promise in the Subcontract to provide a "non-contributory" liability policy.[15] Given our conclusion that there was no coverage under the American Dynasty policy for the Casados claim, however, we do not see how ARB can establish any damages for such breach.

An essential element of a claim for breach of contract are damages *resulting from the breach.* (*Vu v. California Commerce Club, Inc.* (1997) 58 Cal.App.4th 229, 233 [68 Cal.Rptr.2d 31].) Causation of damages in contract cases requires that the damages be proximately caused by the defendant's breach. (*Ibid.*; Civ. Code, §§ 3300, 3301.)

---

[15]We note, in passing, that a strong argument can be made (and has been made) by Sasco that the existence of the $10,000 SIR in its policy did not amount to a material breach of the Subcontract, since this was a burden only imposed once under the policy as to a particular claim and it had already been charged to Sasco. ARB does not claim that it was ever called upon to pay such SIR or that any demand with respect to it was ever received. In view of the result we reach, however, we need not reach or discuss this additional argument.

"Under contract principles, the nonbreaching party is entitled to recover only those damages, including lost future profits, which are 'proximately caused' by the specific breach. (See, e.g., *Metzenbaum* v. *R.O.S. Associates* (1986) 188 Cal.App.3d 202, 211 [232 Cal.Rptr. 741]; *Brandon & Tibbs* v. *George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 457 [277 Cal.Rptr. 40] ['lost profits must be the natural and direct consequence of the breach']; 1 Witkin, Summary of Cal. Law [(9th ed. 1987)] Contracts, § 814 ['It [is] essential to establish a causal connection between the breach and the damages sought.'].) Or, to put it another way, the breaching party is only liable to place the nonbreaching party in the same position as if the specific breach had not occurred. Or, to phrase it still a third way, the breaching party is only responsible to give the nonbreaching party the benefit of the bargain to the extent the specific breach deprived that party of its bargain." (*Postal Instant Press, Inc.* v. *Sealy* (1996) 43 Cal.App.4th 1704, 1709 [51 Cal.Rptr.2d 365].)

Applying these principles here, it is clear that Sasco's alleged failure to provide a "non-contributory" liability policy caused no damage to ARB. In view of our conclusion regarding the absence of coverage under the policy, the situation before us is no different than if Sasco had never promised to make ARB an additional insured under the American Dynasty policy. If there was no coverage, then there could be no causal connection between any expense incurred by ARB and Sasco's alleged failure to deliver the promised policy. Thus, the trial court's conclusion that Sasco was liable for the claimed breach of the Subcontract was error.

### DISPOSITION

The judgment and the postjudgment order awarding attorney's fees and costs are reversed. Sasco shall recover its costs on appeal.

Any application by Sasco for attorney's fees under the provisions of article 22.1 of the Subcontract (see fn. 4, *ante*), including attorney's fees incurred on this appeal, should be addressed to the trial court.

Klein, P. J., and Aldrich, J., concurred.