[No. A096749. First Dist., Div. Three. June 20, 2003.]

VITTON CONSTRUCTION CO., INC., et al., Plaintiffs and Appellants, v. PACIFIC INSURANCE CO., Defendant and Respondent.

### COUNSEL

McCormick, Barstow, Sheppard, Wayte & Carruth, James P. Waggoner, Todd W. Baxter and Geni K. Krogstad for Plaintiffs and Appellants.

Gordon & Rees, Donald W. Rees, Steven B. Bitter, Patricia S. Goodman and David C. Hungerford for Defendant and Respondent.

### OPINION

**PARRILLI, J.**—Having concluded a general contractor was not entitled to coverage as an additional insured under a policy held by one of its subcontractors, the trial court granted summary judgment in this subrogation action in favor of the subcontractor's insurer, Pacific Insurance Company (Pacific). In so doing, the court distinguished our decision in *Acceptance Ins. Co. v. Syufy Enterprises* (1999) 69 Cal.App.4th 321 [81 Cal.Rptr.2d 557] (*Syufy*), which addressed identical contractual language. We conclude the undisputed facts of this case satisfy the minimal causal connection required to trigger coverage under the additional insured provision at issue, and therefore we reverse the judgment.

### BACKGROUND

Vitton Construction Company, Inc. (Vitton) agreed to serve as the general contractor on a project to construct a warehouse for Catalytica Bay View, Inc.

(Catalytica) in East Palo Alto. Vitton entered a subcontract agreement with Pacific Erectors, Inc. (PEI) for, among other things, the "[c]utting and installation of roof opening frames." The subcontract required PEI to carry general liability insurance "covering all operations by or on behalf of [PEI] ... and including coverage for: (1) premises and operations; (2) products and completed operations; (3) contractual liability ...; (4) broad form property damage (including completed operations); (5) explosion, collapse and underground hazards; and (6) personal injury liability." The subcontract further required that the general liability policy obtained by PEI name Vitton and the project owner as additional insureds.

A division of CNA Insurance Companies (CNA)[1] issued PEI a commercial general liability policy with a $1 million per-occurrence limit. The policy included a "Blanket Additional Insured" endorsement, which defined as an "additional insured" any person or organization PEI was contractually obligated to add as an additional insured, provided that such a party would only be considered an additional insured "with respect to liability arising out of ... '[y]our work' for that additional insured by or for you." In addition, the CNA policy included an endorsement that specifically named Vitton and the project's owner as additional insureds with respect to "liability arising out of" PEI's work on the Catalytica warehouse.

PEI also obtained an umbrella insurance policy with a $5 million per-occurrence limit from Pacific. In this policy, Pacific agreed to pay damages its insured became liable to pay after the limits of the insured's underlying insurance were exhausted. The policy included in the definition of "Who Is An Insured" parties who were covered by the underlying insurance policy. Specifically, the Pacific policy defined as an "insured": "[a]ny ... person or organization who is an insured under any policy of 'underlying insurance' ..., subject to all the limitations upon coverage and all other policy terms and conditions of such 'underlying insurance' and this policy."

Pursuant to its subcontract, PEI laid decking for the roof structure of the Catalytica warehouse and cut holes in the decking for skylights and HVAC equipment (both of which would be installed by another contractor). PEI completed its work and left the jobsite on February 5, 1997. After PEI left, Vitton employees attached "wood nailers" and "curbs" to the roof openings but did not cover the openings themselves. On February 12, 1997, Aaron Anderson, an employee of a roofing subcontractor, was working on the roof of the Catalytica warehouse when he fell through one of the uncovered holes

---

[1] The policy, printed on a CNA form, states that coverage will be provided by "Transcontinental Insurance Co.," a corporate entity that would appear to be related to CNA. Because the parties later refer to CNA, and not Transcontinental Insurance, as PEI's primary insurance carrier, we shall also refer to this policy as a CNA policy.

PEI had cut in the roof decking. Anderson sustained serious injuries in the fall and sued Vitton, PEI and Catalytica. Anderson's expert witnesses testified in deposition that the general contractor is responsible for maintaining a safe construction site, and they faulted Vitton for failing to cover the roof openings, or make PEI cover the roof openings, at the Catalytica site. In addition, Vitton's president (Howard Fuchs) acknowledged that Vitton, as general contractor, had a responsibility to ensure no one was hurt on the job.

The parties agreed to settle Anderson's case for a total sum of $6 million. CNA, as the primary insurer of PEI, agreed to pay the policy limit of $1 million, as did Gerling America Insurance Company, the primary insurer of Vitton. Vitton's excess insurance carrier, AIU Insurance Company (AIU), funded the remainder of the settlement. Pacific did not contribute to the settlement. Vitton and AIU then brought the instant action against Pacific, seeking equitable indemnity, subrogation, contribution and declaratory relief on the ground that Vitton was an additional insured entitled to coverage under the umbrella policy Pacific issued to PEI. After Pacific answered the complaint, the parties filed cross motions for summary judgment. In addition to maintaining Vitton was an additional insured under the Pacific policy, AIU argued it was entitled to recover subrogation or contribution from Pacific as a matter of law. Pacific argued Vitton was not an additional insured covered by the policy because Vitton's liability for the Anderson accident did not "arise out of" work performed by PEI. The trial court agreed with Pacific and granted its motion for summary judgment without reaching the question of AIU's equitable rights against Pacific.[2]

## DISCUSSION

"Summary judgment is proper only if there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A court must 'strictly construe the moving party's papers and liberally construe those of the opposing party to determine if they raise a triable issue of material fact.' [Citation.]" (*Calhoon v. Lewis* (2000) 81 Cal.App.4th 108, 112 [96 Cal.Rptr.2d 394].) On appeal, "we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.]" (*Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) When there is no dispute as to the relevant facts, we exercise our independent judgment as to

---

[2] In view of its decision that the Pacific policy did not cover Vitton, the lower court had no reason to address, and did not address, the extent of Pacific's obligation to contribute to the Anderson settlement. Because the trial court rendered no decision on the issue, it is not properly before us in this appeal. Thus, despite the parties' lengthy discussions of subrogation and contribution, we express no opinion on AIU's right to recover under these doctrines.

their legal effect. (*Syufy, supra,* 69 Cal.App.4th at p. 324.) As in the *Syufy* case, the issue before us concerns the meaning and application of language in an insurance policy, which is purely an issue of law. (*Ibid.*) Because Pacific's umbrella policy provided that coverage extended to any entity that was insured by an "underlying insurance" policy, the only question on appeal is whether Vitton was covered under the additional insured endorsement of the CNA policy.

■ Insurance policies are construed according to the same principles that govern interpretation of other contracts. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].) "Thus, 'the mutual intention of the parties at the time the contract is formed governs interpretation.' [Citation.] If possible, we infer this intent solely from the written provisions of the insurance policy. [Citation.] If the policy language 'is clear and explicit, it governs.' [Citation.] [¶] When interpreting a policy provision, we must give its terms their ' "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage." ' [Citation.] ... [¶] A policy provision is ambiguous *only* if it is susceptible to two or more reasonable constructions despite the plain meaning of its terms within the context of the policy as a whole. [Citation.]" (*Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115 [90 Cal.Rptr.2d 647, 988 P.2d 568].) If a provision is determined to be ambiguous, "[t]he court may then 'invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage.' [Citation.]" (*Ibid.*)

In *Syufy,* we applied these principles to interpret precisely the same contractual language at issue in the present case—i.e., an endorsement extending coverage to a party as an additional insured " 'but only with respect to liability arising out of "your work" for that insured by or for you' " (where the terms "you" and "your" referred to the named insured). (*Syufy, supra,* 69 Cal.App.4th at p. 324.) We did not specifically decide whether the language is ambiguous in light of the fact that it would be necessary to construe any such ambiguity liberally, in favor of finding coverage. (*Id.* at pp. 326–328; but see *St. Paul Fire & Marine Ins. Co. v. American Dynasty Surplus Lines Ins. Co.* (2002) 101 Cal.App.4th 1038, 1055–1056 [124 Cal.Rptr.2d 818] [finding ambiguous, with respect to the facts of the case, an additional insured endorsement that limited coverage to liability arising out of the named insured's " 'ongoing operations performed for' " the additional insured] (*St. Paul*).) Based on a review of several cases, we observed: "California courts have consistently given a broad interpretation to the terms 'arising out of' or 'arising from' in various kinds of insurance provisions. It is settled that this language does not import any particular standard of causation or theory of liability into an insurance policy. Rather, it broadly links a

factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship. [Citations.]" (*Syufy, supra,* at p. 328.) The words are generally given their "commonsense meaning" (*Fibreboard Corp. v. Hartford Accident & Indemnity Co.* (1993) 16 Cal.App.4th 492, 503 [20 Cal.Rptr.2d 376] (*Fibreboard*)), which has been " ' "understood to mean 'originating from' 'having its origin in,' 'growing out of' or 'flowing from' or in short, 'incident to, or having connection with'.... " ' (*Continental Cas. Co. v. City of Richmond* (9th Cir. 1985) 763 F.2d 1076, 1080.)" (*Fibreboard, supra,* at p. 504.)

Pacific does not challenge *Syufy*'s holding that a minimal causal connection will suffice to trigger coverage under an "arising out of" clause. (*Syufy, supra,* 69 Cal.App.4th at p. 328; see also *Fireman's Fund Ins. Cos. v. Atlantic Richfield Co.* (2001) 94 Cal.App.4th 842, 849 [115 Cal.Rptr.2d 26] [concluding the facts demonstrated a "minimal causal connection" sufficient to trigger coverage] (*Fireman's Fund*).) Rather, Pacific argues the facts of this case do not satisfy even this minimal level of causation. We disagree. Although the causal nexus between PEI's work and Vitton's liability for Anderson's fall is arguably not as clear as the links were in *Syufy* and *Fireman's Fund* (see *St. Paul, supra,* 101 Cal.App.4th at p. 1050 [observing those cases "provide a clear illustration of the consistently broad interpretation given by California courts to phrases such as 'arising out of' or 'arising from' and 'resulting from' "]), the connection is sufficient to trigger coverage under the broad language of the additional insured endorsement.

The facts of this case are not complicated. Pursuant to its subcontract, PEI created holes or openings in the roof of the Catalytica warehouse. The holes were left uncovered, and a roofer accidentally fell through one of them while he was working on the roof. Using common sense (see, e.g., *Syufy, supra,* 69 Cal.App.4th at p. 328; *Fibreboard, supra,* 16 Cal.App.4th at p. 503), it seems fairly clear Anderson's fall "arose out of" PEI's work in cutting the roof openings. Regardless of whether it was PEI's responsibility to make the holes safe, the fact is PEI's work created the dangerous condition that gave rise to Anderson's accident. Under these circumstances, we conclude there is a sufficient "minimal causal connection" between the named insured's work and the situation giving rise to liability to trigger coverage for Vitton as an additional insured.

Nevertheless, Pacific argues the undisputed evidence shows PEI was not negligent. Vitton was the party responsible for ensuring safety at the site, and after PEI completed its work under the subcontract and left the jobsite, Vitton employees did work on the roof openings (i.e., installing nailers and curbs) and yet failed to cover these openings to prevent an accident. ▮ However, the fact that an accident is not attributable to the named insured's

negligence is *irrelevant* when the additional insured endorsement does not purport to allocate or restrict coverage according to fault. (*Syufy, supra,* 69 Cal.App.4th at pp. 328–329; see also *Fireman's Fund, supra,* 94 Cal.App.4th at pp. 848, 852–853 [rejecting argument that coverage does not apply because accident resulted solely from negligence of the additional insured].) As we explained in *Syufy,* "Insurance companies are free to, and commonly have, issued additional insured endorsements that specifically limit coverage to situations in which the additional insured is faced with vicarious liability for negligent conduct by the named insured. [Citations.] We believe the better view is that when an insurer chooses not to use such clearly limited language in an additional insured clause, but instead grants coverage for liability 'arising out of' the named insured's work, the additional insured is covered without regard to whether injury was caused by the named insured or the additional insured." (*Syufy, supra,* at p. 330.)[3]

The trial court read our decision in *Syufy* too narrowly when it distinguished the case on its facts. In *Syufy,* a contractor's employee had been working on the roof of a theater. When he was descending from the roof through a hatch, on his way to run an errand on a break from work, he fell and injured himself. (*Syufy, supra,* 69 Cal.App.4th at p. 324.) He sued the theater's owner, which was responsible for maintaining the roof hatch in a safe condition and which sought coverage under an additional insured endorsement in the contractor's insurance policy. (*Id.* at pp. 324–325.) Under these facts, we concluded the roofer's injury "clearly 'arose out of' the work he was performing on the roof of Syufy's building." (*Id.* at p. 328.) We observed, "[t]he relationship between the defective hatch and the job was more than incidental, in that Weber could not have done the job without passing through the hatch." (*Ibid.*)

At a hearing on the summary judgment motions, the trial court distinguished *Syufy* because the injured party's job required him to use the defective hatch, whereas Anderson was by no means required to pass through a roof opening. But this distinction misses the point. Certainly Anderson was not required to fall through a hole, but his job *did* require him to be on the warehouse roof, in close proximity to the dangerous condition (created by PEI's work) that caused his injury. The trial court ignored this point in concluding there was "no evidence of any relationship between the roof opening and Mr. Anderson's performance of his duties." The court also distinguished *Syufy* on the grounds that: (1) the accident occurred after PEI

---

[3] Moreover, to the extent Pacific maintains the negligence of Vitton was an intervening cause of Anderson's injury, the standard of causation required is clearly something *less* than proximate cause. (See *Syufy, supra,* 69 Cal.App.4th at p. 329 [discussing cases that describe the "arising under" standard as an intermediate level of causation between "but-for" and proximate causation].)

had completed its work on the project, and (2) the injured party was not an employee of PEI. These are not meaningful differences considering that the language of the insurance policy does not restrict coverage on these bases. Clearly, the policy does not limit coverage for personal injury liability to cases involving injury to the subcontractor's employees, nor does it purport to limit coverage to liability arising from events that occur during the subcontractor's operations. On the contrary, consistent with the insurance requirements stated in PEI's subcontract, the CNA policy extended coverage to liability resulting from PEI's "completed operations."

The parties suggest Division Three of the Second District Court of Appeal adopted a contrary position in the *St. Paul* case. (*St. Paul, supra,* 101 Cal. App.4th 1038 [124 Cal.Rptr.2d 818].) In *St. Paul,* a subcontractor's employee was at work feeding electrical lines through a conduit; meanwhile, completely independent of this work, employees of the general contractor were pressure testing a pipe. During this testing, a portion of the pipe exploded and metal fragments struck the subcontractor's employee in the leg. (*Id.* at p. 1045.) The general contractor sought coverage under an additional insured endorsement in the subcontractor's policy, which stated coverage would be provided " 'only with respect to liability arising out of' " the subcontractor's " 'ongoing operations performed for' " the general contractor. (*Id.* at p. 1043.) The appellate court concluded the facts did not support coverage under this clause for two reasons. First, the court noted the pipe explosion "had *nothing* to do" with the subcontractor's performance of the subcontract, "but rather resulted entirely from activities in which [the general contractor] was separately and independently engaged." (*Id.* at pp. 1058–1059.) The injured employee's "presence nearby was *entirely incidental* to [the general contractor's] pressure testing activity." (*Id.* at p. 1059.) Second, although the subcontract required the subcontractor to indemnify and provide liability insurance for the general contractor, the indemnification promise was "*expressly* limited" to liability arising from the subcontractor's own acts or omissions (and thus "necessarily excluded indemnification for claims arising solely from the acts or negligent misconduct of [the general contractor]"). (*Ibid.*) Further, the subcontract only required the subcontractor to provide liability coverage for the general contractor with respect to claims arising from the subcontractor's " 'operations under [the Subcontract].' " (*Ibid.*)

The *St. Paul* case thus construed different contractual and policy language than we face here. The subcontract required PEI to name Vitton as an additional insured on general liability insurance "covering all operations by or on behalf of [PEI] ... including ... completed operations." More importantly, unlike the endorsement in *St. Paul,* the additional insured endorsement here did not limit coverage to liability arising out of the subcontractor's " 'ongoing operations performed for' " the general contractor. (See *St. Paul, supra,* 101 Cal.App.4th at p. 1043.) The facts giving rise to liability were also different

in *St. Paul*. There, the injury-causing incident was completely unrelated to work that was done or being done by the subcontractor. The *only*.connection between the incident giving rise to liability (i.e., the pipe explosion) and the subcontractor's work was the fact that the employee who was injured while working in the vicinity happened to be employed by the subcontractor. In other words, but for the subcontractor's work at the jobsite, its employee would not have been present and vulnerable to injury. The *St. Paul* court reasonably concluded this connection was too thin to support a finding of coverage under the endorsement at issue. (*Id.* at p. 1059 ["[T]he injury-causing act must somehow be related or connected to [the subcontractor's] performance of the work under the subcontract *beyond its mere presence on the jobsite*"].) Our case presents the reverse scenario: Here, the subcontractor PEI was no longer present at the jobsite, but PEI's work—cutting holes in the roofing material—created the very condition that led to Anderson's fall and resulting injury.

Nor does *Hartford v. State of California* (1996) 41 Cal.App.4th 1564 [49 Cal.Rptr.2d 282] support Pacific's position. Pursuant to a booth rental agreement, exhibitors at the California State Fair obtained liability insurance covering the State and other entities as additional insureds " 'but only insofar as the operations under this contract are concerned.' " (*Id.* at p. 1567.) An exhibitor's grandchild accompanied her to the fair but then wandered away from the exhibitor's booth, climbed to the top of a set of bleachers about 100 feet away, and was injured when a safety bar on the bleachers gave way, causing the child to fall. (*Ibid.*) The court concluded the State was not covered under the additional insured endorsement in the exhibitor's policy because "coverage ... was strictly limited to the operations stated in the rental agreement—to the use of the 20-by-50 foot space for a booth to display and sell JRS products." (*Id.* at p. 1569.) The child was not involved in setting up the booth, and he was injured elsewhere in the fairgrounds, "on a structure which had no relationship to the operations of [the exhibitor]." (*Id.* at p. 1570.) Although not directly relevant (because the policy at issue does not include, and the court does not construe, an arising under clause), the *Hartford* case provides a clear example of an argument premised on mere "but-for" causation: The only connection between the grandchild's accident and the exhibitor' s operations was the fact that but for these operations (and the grandmother's need to participate in them), the child would not have been present on the fairgrounds. But, as we discussed in distinguishing the facts of *St. Paul*, Vitton presents a much stronger causation argument because Anderson was injured as a direct result of encountering a condition (i.e., an opening in the roof) that PEI created in the course of its work for Vitton.

## DISPOSITION

The judgment is reversed. Pacific shall bear costs of the appeal.

Corrigan, Acting P. J., and Pollak, J., concurred.

On July 18, 2003, the opinion was modified to read as printed above.