[No. G035046. Fourth Dist., Div. Three. Feb. 28, 2007.]

TRANSCONTINENTAL INSURANCE COMPANY et al., Plaintiffs and Respondents, v.
INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA,
Defendant and Appellant.

1298

**COUNSEL**

Lewis, Brisbois, Bisgaard & Smith, Jordan Harriman; Ropers, Majeski, Kohn & Bentley, Mark G. Bonino and Michael J. Quinn for Defendant and Appellant.

Howard Rice Nemerovski Canady Falk & Rabkin, Jerome B. Falk, Jr., Amy E. Margolin; Law Offices of Timothy J. Hogan and Timothy J. Hogan for Plaintiffs and Respondents.

## OPINION

**O'LEARY, Acting P. J.**—This appeal concerns an insurance coverage dispute between an excess insurer and a primary insurer over the obligation to defend a housing developer in a construction defect case. The court determined the excess insurer, Insurance Company of the State of Pennsylvania (ISOP), had an obligation to pay the developer's defense costs. ISOP asserts other carriers providing coverage for several subcontractors, and which named the developer as an additional insured, had the duty to provide defense coverage. It asserts the California rule of "horizontal exhaustion" required the payment from these primary policies before any excess or umbrella policies could be triggered. We conclude the trial court got it right. The judgment is affirmed.

I

FACTS

Barratt American, Inc., Windsong Partners, and Pacific Gateway Homes (collectively Barratt) are the developers of the Windsong Common Interest Development in Orange County. Barratt hired several subcontractors to work on the project. It also secured several layers of insurance protection.

First, Barratt obtained primary insurance coverage from United National Insurance to provide indemnity against all losses. Second, Barratt required each subcontractor to obtain a commercial general liability policy, and for those carriers to issue "additional insured endorsements" to Barratt. Ten of the subcontractors obtained their coverage from the "CNA Affiliated Companies," comprised of Transcontinental Insurance Company, The Continental Insurance Company, and The Valley Forge Insurance Company (collectively referred to as CNA).

CNA's policies contain essentially the same additional insured provisions. Relevant to this case, each contained a provision limiting coverage for Barratt, agreeing to indemnify only against liability arising out of the subcontractors' own work on the project.[1]

As a final layer of protection, Barratt obtained four excess insurance policies from ISOP, containing the following indemnity provisions:

---

[1] For example, the policy written for the painting subcontractor stated, "The insurance provided to the additional insured is limited as follows: [¶] 1. That person or organization is only an additional insured with respect to liability arising out of [¶] . . . [¶] b. 'Your work' for that additional insured by or for you." In addition, it was specified, "The insurance provided to the additional insured does not apply to 'bodily injury', 'property damage', 'personal injury', or 'advertising injury' arising out of an architect's, engineer's, or surveyor's rendering of or failure to render any professional services . . . ."

(1) "Defense, Settlement and Supplementary Payments: Should applicable underlying insurance(s) become exhausted by payment of covered claims, this insurance will continue in force as underlying insurance and shall defend any suit arising out of a covered occurrence, as respects occurrences not covered under the underlying insurance(s), but covered by this policy, the company shall likewise defend any suit . . . ." and (2) "Coverage: To pay on behalf of the insured that portion of the ultimate net loss in excess of the retained limit as hereinafter defined, which the insured shall become legally obligated to pay as damages to third parties for liability imposed upon the insured by law, or liability assumed by the insured under contract because of (i) personal injury, (ii) property damage, or (iii) advertising liability as defined herein . . . ."

In 1997, the Windsong Community Association filed a construction defect lawsuit. Barratt tendered the defense to its primary carrier and that policy soon became exhausted. Barratt next tendered the defense to ISOP and various carriers for the subcontractors. ISOP initially paid over $600,000, but then asserted it had no defense obligation. It demanded reimbursement from the subcontractors' carriers having policies naming Barratt as an additional insured.

Under the threat of litigation from Barratt, CNA paid approximately $1.2 million in defense fees and costs, but did so under the agreement it had full and complete reservation of rights to later seek contribution from ISOP and other carriers. It also reimbursed ISOP the defense fees and costs previously paid.

The Windsong case settled for $5.5 million. ISOP paid $1.5 million in indemnity. It paid no defense costs. On behalf of the subcontractors, CNA paid less than $150,000 in indemnity.

CNA filed a complaint for declaratory relief and equitable contribution against ISOP and several other insurance carriers. It asserted ISOP must share in Barratt's defense costs in the Windsong construction defect case. ISOP responded with a summary judgment motion (MSJ), arguing carriers for some of the subcontractors had issued "additional insured endorsements" naming Barratt, and the limits of all those policies had to be exhausted to trigger ISOP's defense obligation.

The court denied the MSJ, concluding the CNA additional insured endorsements provided coverage for only "derivative risk" and not for Barratt's direct negligence, and consequently there was no defense obligation. However, the court determined ISOP insured Barratt for a wide spectrum of risks, including its direct negligence, and the defense obligation was therefore triggered.

This court denied ISOP's petition for writ of mandate challenging the court's ruling. The parties asked the court to enter a stipulated judgment in favor of CNA to appeal the court's ruling. They entered a judgment by stipulating "that if [CNA] were to file a[n MSJ] based on the same pleadings, exhibits, and declarations presented to the [c]ourt in connection with [ISOP's] prior [MSJ], as augmented by [a few facts described in paragraph two of the stipulation], the court would grant said [MSJ] on the same basis that it denied [ISOP's] prior [MSJ], and enter judgment . . . ."

In addition, the agreement stated, "The parties have reached an agreement and stipulation as to the amount of defense costs incurred for the defense of Barratt . . . in the underlying Windsong . . . action . . . ." Moreover, they agreed "in order to avoid the unnecessary expenditure of court time and attorneys' fees and costs, the parties have agreed upon an appropriate allocation to [ISOP] of that portion of the unreimbursed attorneys' fees and costs paid by [CNA]."

II

### THE DUTY TO INDEMNIFY VERSUS THE DUTY TO PAY DEFENSE COSTS

We begin by noting the parties do not dispute their respective duties to indemnify Barratt for the settlement of the Windsong lawsuit. After exhaustion of the United National Insurance Policy, the excess policy from ISOP provided indemnity for claims against Barratt in the amount of $1.5 million. CNA's policies, which limited indemnity coverage to losses arising out the work of 10 subcontractors, paid $150,000 of the settlement. It is unclear who paid the remaining portion of the $5.5 million settlement, but there were approximately 40 other insurance companies representing over 60 subcontractors involved in the underlying litigation.

The above disparity in payments towards the settlement shows the lawsuit involved, what is commonly referred to in insurance law, as a "mixed" action. This means not all the potential liability was covered by all the various carriers and some insurers' coverage was limited to specific claims. Relevant to this case, CNA was required to indemnify only for liability arising out of work performed by its 10 insured subcontractors, which amounted to $150,000 of the $5.5 million settlement. Given this relatively small indemnity bill, it is understandable why CNA is unhappy about the fact it paid a disproportionate share of the defense fees and costs (over $1.2 million).

CNA also makes clear that it does not dispute its *initial* obligation to provide a full and complete defense of all claims asserted in the lawsuit. It

correctly recognized that in insurance law, "It is settled that where an insurer has a duty to defend, the obligation generally applies to the entire action, even though the suit involves both covered and uncovered claims, or a single claim only partially covered by the policy. [Citations.]" (*Presley Homes, Inc. v. American States Ins. Co.* (2001) 90 Cal.App.4th 571, 575 [108 Cal.Rptr.2d 686] (*Presley Homes*).) "[A] subcontractor's insurer must provide a defense to a developer listed as an additional insured under the subcontractor's liability policy when the developer is sued by a third party for construction defects allegedly resulting from the subcontractor's work. [Citation.]" (*Id.* at pp. 574–575.) This obligation "is based on public policy, not the terms of the parties' contract." (*Id.* at p. 576.)[2]

Having provided Barratt a complete defense in the Windsong lawsuit, CNA can now seek reimbursement from the other insurers obligated to defend the lawsuit under principles of equity. (See *Maryland Casualty Co. v. Nationwide Mutual Ins. Co.* (2000) 81 Cal.App.4th 1082, 1088 [97 Cal.Rptr.2d 374] (*Maryland*).) As explained in *Maryland,* "In the insurance context, equitable subrogation and equitable contribution doctrines each pertain to the allocation of costs when there is more than one potentially responsible insurance company. But, the two doctrines are 'entirely different' concepts. [Citation.]" (*Ibid.*) As we will explain, CNA's claim for reimbursement against ISOP invokes the doctrine of equitable subrogation.

### III

#### Equitable Subrogation and Equitable Contribution

"Equitable subrogation allows an insurer that paid coverage or defense costs to be placed in the insured's position to pursue a full recovery from another insurer who was primarily responsible for the loss. [Citation.] Because this doctrine shifts the entire cost burden, the moving party insurer must show the other insurer was *primarily* liable for the loss and that the moving party's equitable position is *inferior* to that of the second insurer. [Citations.]" (*Maryland, supra,* 81 Cal.App.4th at pp. 1088–1089.)

"Equitable contribution, on the other hand, applies to apportion costs among insurers that share the same level of liability on the same risk as to the same insured. [Citation.] It 'arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by

---

[2] We wish to clarify that the facts of this case involve a claim between a developer and the subcontractor's insurer, as opposed to a claim between a developer and an individual subcontractor who has contractually agreed to indemnify and/or defend.

the others.' [Citation.] 'The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others.' [Citations.]" (*Maryland, supra,* 81 Cal.App.4th at p. 1089.)

In this case, equitable contribution cannot apply because CNA and ISOP did not share the same level of liability and were not obligated to defend the same loss or claim. CNA's level of liability was as a primary insurer for several subcontractors and the developer (as an "additional insured"). However, its overall risk was limited to claims "arising out of" the particular subcontractor's own work on the project. CNA never agreed to be obligated for liability totally unrelated to the work of those subcontractors.

As an excess carrier, ISOP bargained for a different kind of liability, and its potential obligation for coverage was limited differently than CNA's. ISOP agreed to pay only when the various underlying insurance became exhausted on any "covered claims." This obligation potentially could include claims involving Barratt's torts, as well as liability arising from the subcontractors' work.[3]

■ As ISOP points out, ordinarily there is no *contribution* between a primary and an excess carrier (the rule of horizontal exhaustion). "Primary coverage is insurance coverage whereby, under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to liability. . . . [¶] 'Excess' or secondary coverage is coverage whereby, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted." (*Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.* (1981) 126 Cal.App.3d 593, 597–598 [178 Cal.Rptr. 908], italics & fn. omitted.)

However, there can be equitable subrogation between a primary and excess carrier in limited circumstances: "[W]here different insurance carriers cover differing risks and liabilities, they may proceed against each other for reimbursement by subrogation rather than by contribution. [Citations.]" (*Reliance Nat. Indemnity Co. v. General Star Indemnity Co.* (1999) 72 Cal.App.4th 1063, 1077–1079 [85 Cal.Rptr.2d 627]; see *Commercial Union*

---

[3] We reject CNA's assertion equitable contribution applies because it and ISOP shared the same level of obligation on the same risk as soon as the United National Insurance policy was exhausted. Applying basic rules of contract law, an insurer's obligation and the scope of coverage are defined by the terms of the insurance contract. (See *Vitton Construction Co., Inc. v. Pacific Ins. Co.* (2003) 110 Cal.App.4th 762, 766 [2 Cal.Rptr.3d 1] [intent of the parties at contract formation governs interpretation].) Although ISOP's excess insurance was triggered when the underlying policy was exhausted, this event did not change the fact the policy was written to cover different risks and parties than CNA's policy.

*Assurance Companies v. Safeway Stores, Inc.* (1980) 26 Cal.3d 912, 917–918 [164 Cal.Rptr. 709, 610 P.2d 1038].)[4] Such is the case here. The issue presented in this case is whether CNA was entitled to equitable subrogation against ISOP for reimbursement of defense costs.

## IV

### ELEMENTS OF EQUITABLE SUBROGATION

"In the case of insurance, subrogation takes the form of an insurer's right to be put in the position of the insured in order to pursue recovery from third parties legally responsible to the insured for a loss which the insurer has both insured and paid. [Citations.] ' "As now applied [the doctrine of equitable subrogation] is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter." [Citations.]' [Citation.]" (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1291–1292 [77 Cal.Rptr.2d 296] (*Fireman's Fund*).)

"The essential elements of an insurer's cause of action for equitable subrogation are as follows: (a) the insured suffered a loss for which the defendant is liable, either as the wrongdoer whose act or omission caused the loss or because the defendant is legally responsible to the insured for the loss caused by the wrongdoer; (b) the claimed loss was one for which the insurer was *not* primarily liable; (c) the insurer has compensated the insured in whole or in part for the same loss for which the defendant is primarily liable; (d) the insurer has paid the claim of its insured to protect its own interest and not as a volunteer; (e) the insured has an existing, assignable cause of action against the defendant which the insured could have asserted for its own benefit had it not been compensated for its loss by the insurer; (f) the insurer has suffered damages caused by the act or omission upon which the liability of the defendant depends; (g) justice requires that the loss be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer; and (h) the insurer's damages are in a liquidated sum, generally the amount paid to the insured. [Citations.]" (*Fireman's Fund, supra*, 65 Cal.App.4th at p. 1292.)

"The right of subrogation is purely derivative. An insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and

---

[4] Because this case concerns equitable subrogation, we need not address ISOP's extensive discussion of the horizontal exhaustion rule as those cases invoke the doctrine of equitable contribution, which is not controlling in this case.

succeeds only to the rights of the insured. The subrogated insurer is said to ' "stand in the shoes" ' of its insured, because it has no greater rights than the insured and is subject to the same defenses assertable against the insured. Thus, an insurer cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which the insured does not have. [Citations.]" (*Fireman's Fund, supra*, 65 Cal.App.4th at pp. 1292–1293.)

 The parties primarily focus their discussion on appeal to the second element of equitable subrogation, i.e., was "the claimed loss . . . one for which the insurer was *not* primarily liable." (*Fireman's Fund, supra*, 65 Cal.App.4th at p. 1292.) ISOP asserts CNA was primarily liable for *all* the defense costs. It provides a lengthy summary of insurance cases holding a defense obligation in an additional insured endorsement must be interpreted broadly. (Citing *Acceptance Ins. Co. v. Syufy Enterprises* (1999) 69 Cal.App.4th 321, 324 [81 Cal.Rptr.2d 557].) These cases show that courts agree the "arising out of" language used in most endorsements requires only a minimal connection between the liability and the subcontractor's operations to trigger coverage. (*Id.* at pp. 328–329.)

Based on the above legal premise, ISOP offers two reasons for this court to hold CNA was primarily liable for all the defense costs. The first argument can be easily dealt with. ISOP asserts CNA clearly admitted in the respondent's brief it had a duty to defend all of the claims brought against the developer. We conclude ISOP has misconstrued the statements made in the brief.

As stated earlier, CNA does not dispute its *initial* obligation to provide a complete defense of all claims, even though the suit was a mixed action and involved some uncovered claims. (See *Presley Homes, supra*, 90 Cal.App.4th at pp. 574–575.) Under the rules of insurance law, this public-policy-based obligation to provide the insured with a complete defense is widely recognized not to "result in any unfairness" because the insurer can always later seek either equitable subrogation or contribution from other insurers obligated to defend the claim. (*Id.* at p. 577.)

Here, CNA paid the complete defense costs under threat of litigation from the developer. And, it paid only after reserving full and complete rights to later seek reimbursement from the other carriers. Its payment cannot be deemed an admission of full liability in a later subrogation action. And, we found nothing in its briefs suggesting it waived its reservation of rights or it now concedes complete liability.

ISOP's second argument is more complicated, but also lacks merit. It asserts "each claim in the underlying action allegedly arose out of the work

of the subcontractor on the Windsong project and, therefore, <u>each</u> of those claims gave rise to a duty under the CNA policies to defend." ISOP relies on the Supreme Court's decision in *Buss v. Superior Court* (1977) 16 Cal.4th 35, 49 [65 Cal.Rptr.2d 366, 939 P.2d 766] (*Buss*), for the legal argument an insurer has an immediate duty to defend its insured against merely potentially covered claims and cannot later seek reimbursement. ISOP reads too much into *Buss*.

■ The *Buss* case involved whether an insurer could seek reimbursement for defense costs paid on behalf of a corporation having a standard commercial general liability insurance policy. (*Buss, supra*, 16 Cal.4th at p. 39.) The Supreme Court discussed why the insurer's duty to defend is broader than its duty to indemnify. (*Id.* at p. 46.) It reaffirmed, "[T]he insurer's duty to defend the entire 'mixed' action" cannot be justified contractually, but is "an obligation arising out of policy." (*Id.* at p. 48.)[5]

In light of these established legal concepts, the court in *Buss* held, among other things, that an insurer can seek reimbursement from the insured for costs associated with defending claims that are not potentially covered by the insurance policy. (*Buss, supra*, 16 Cal.4th at p. 50.) It reasoned that with respect to these defense costs, "the insurer has not been paid premiums by the insured. It did not bargain to bear these costs. To attempt to shift them would not upset the arrangement." (*Id.* at p. 51.) The court noted, "[T]he insurer will presumably take the safer course of defending the entire 'mixed' action and then seeking reimbursement for defense costs that can be allocated solely to the claims that are not even potentially covered." (*Id.* at p. 59, fn. omitted.) Of course, reimbursement is not available for "claims that are at least potentially covered" for the same reasons those not covered are reimbursable. (*Id.* at p. 49.)

■ CNA argues the Windsong lawsuit contained claims not even potentially covered by CNA's additional insured policy, and defense costs related to those claims were reimbursable. It highlights two causes of action: First, it points to the claim for negligent misrepresentation "arising from the developer's allegedly untrue or misleading advertising concerning the development." Specifically, the complaint alleged the developer deceived the public by creating literature stating future owners of the homes would be buying "superior location, design, and top-notch construction which deliver outstanding value today, and pride of ownership for years to come." It was asserted the developer made the misrepresentations having "no reasonable ground for believing them to be true . . . ." This claim arose from the literature designed

---

[5] Again, ISOP appears to confuse the issues of what is the scope of the subcontractors' carriers to initially defend the action for the insured with the issue of equitable allocation of defense costs between insurers having a duty to defend. The two issues are very distinct.

by the developer, not the subcontractors. Although the phrase " 'arising out of' " should be broadly read to require only a minimal causal connection, it requires more than " 'but for' " causation. (*Fireman's Fund Ins. Cos. v. Atlantic Richfield Co.* (2001) 94 Cal.App.4th 842, 849 [115 Cal.Rptr.2d 26].) We agree, the creation and dissemination of the false literature was not a natural consequence of any of the subcontractors' work, and it was not something which arose from the subcontractors' direction or control. (*Id.* at pp. 850–851.)

Another claim for which CNA's policies provided no potential coverage was the cause of action for the developer's breach of its fiduciary duty to the Windsong homeowners association who were the plaintiffs in the lawsuit. The complaint alleges Barratt, "in an attempt to secure sales, did unreasonably and fraudulently contrive inadequate monthly budgets by understating the reserve and operating costs . . . ." It was argued this breach caused the association to be misled as to the maintenance expenses for the development's common areas. The association asserted the developer should have adjusted "the monthly dues when confronted with the reality of reasonable expenses and necessary maintenance" and should have funded and maintained an adequate reserve account. We fail to see any connection at all between this purported breach and the 10 subcontractors' work.

██ Although there may be other causes of action, we need not investigate further.[6] The fact CNA was *not* primarily liable for these defense costs satisfies the second element required under equitable subrogation, i.e., not all of the claimed loss was one for which CNA was primarily liable. (See *Fireman's Fund, supra,* 65 Cal.App.4th at p. 1292.)

The other elements of subrogation have also been satisfied. The first element required Barratt to have suffered a loss for which ISOP was legally responsible. (*Fireman's Fund, supra,* 65 Cal.App.4th at p. 1292 [listing elements].) For the false advertising and breach of fiduciary claims, the parties appear to agree the United National Insurance policy provided the primary coverage. Consequently, its exhaustion would have triggered coverage under the ISOP excess policy.[7] ISOP's insurance contract with the developer contains a provision stating it was obligated to pay defense costs, "Should applicable underlying insurance(s) become exhausted by payment of

---

[6] We note, in its opening brief, ISOP states, "[M]ost, if not all, of the claims in the underlying lawsuit were potentially covered by the additional insured policies." It later notes, "At the very least, the instant action is 'mixed' in which some of the claims are covered under the subcontractors' policies and some are not."

[7] ISOP did not argue or present evidence below, or on appeal, to show the breach of fiduciary duty and/or false advertising claims would never be potentially covered by its excess policy. Our record does not contain the actual United National Insurance policy's coverage provisions, and ISOP never disputed that policy's obligation to cover those claims.

covered claims. . . ." It guaranteed, "This insurance will continue in force as underlying insurance and shall defend any suit arising out of a covered occurrence. . . . [O]ccurrences not covered under the underlying insurance(s) but covered by this policy, the company shall likewise defend any suit . . . ." Thus, ISOP was legally responsible for the defense costs and indemnity relating to at least those two causes of action.

At oral argument, ISOP asserted for the first time there was insufficient evidence to prove there was a portion of the defense costs attributable to the claims not even potentially covered. (See *Buss, supra*, 16 Cal.4th at pp. 52–53.) ISOP argued this is another reason why the summary judgment must be reversed. For obvious reasons of fairness, it is not appropriate to rely upon points not mentioned in the parties' briefs. (See *Estate of Davis* (1940) 38 Cal.App.2d 579, 587 [102 P.2d 545]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 665, p. 698.)

Moreover, issues not raised in the trial court will not be considered on appeal. (*Estate of Westerman* (1968) 68 Cal.2d 267, 279 [66 Cal.Rptr. 29, 437 P.2d 517].) We have not forgotten this appeal arises from a stipulated judgment entered after ISOP's MSJ was defeated. ISOP's stipulation the court may grant CNA's MSJ based on the evidence contained in the record forfeits its right to now argue the contrary on appeal.

Moving on to the second element, we have already addressed how it was satisfied. Simply stated, CNA is not primarily liable for the defense costs associated with at least two causes of action. As required by the third element, it is undisputed CNA compensated the insured for the same loss for which ISOP was primarily liable. (See *Fireman's Fund, supra*, 65 Cal.App.4th at p. 1292 [elements of subrogation].) CNA paid all the defense costs for the developer, including those relating to the false advertising and breach of fiduciary duty claims. The fourth element required evidence CNA paid the claim "to protect its own interest and not as a volunteer." (*Ibid.*) It was undisputed the defense costs were paid under threat of litigation and with the reservation of rights to seek reimbursement. There is also no dispute the sixth and eighth elements concerning damages were satisfied. (*Ibid.*)

Finally, the seventh element questions whether "justice requires" the loss be shifted to ISOP, "whose equitable position is inferior to that of the insurer." (*Fireman's Fund, supra*, 65 Cal.App.4th at p. 1292.) CNA bargained to bear the defense costs for potentially covered claims, which did not include Barratt's purported false advertising or breach of fiduciary duty. And as asserted by CNA, "An insurer that *breaches* its defense obligations to its insured should not gain a windfall at the expense of another insurer that *honors* them." Moreover, if CNA cannot recover a fair share of the defense

costs from ISOP, its alternative would be to recover a portion of the defense costs from the insured, who would be left to bear those costs or file a suit against ISOP. It cannot be said those alterative scenarios would accomplish justice.

## V

### DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

Moore, J., and Ikola, J., concurred.