Filed 11/20/25  Ignite International v. 10979 Chalon CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| IGNITE INTERNATIONAL, LTD., | B339321 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 21STCV16002) |
| v. | |
| 10979 CHALON, LLC, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel S. Murphy, Judge.  Reversed.

Flangas Law Group and Kimberly P. Stein for Plaintiff and Appellant.

Kousha Berokim for Defendant and Appellant.

_____

This appeal is about the trial court's award of damages for breach of an agreement that settled the parties' disputes arising out of their failed landlord-tenant relationship. In exchange for the tenant vacating the property, the landlord agreed to sell the property and to pay the tenant a sum dependent on the amount yielded from the sale, with $2.5 million being the lowest sum. If the property did not sell at all, then the tenant would receive a $2.5 million promissory note and second deed of trust against the property. The property did not sell.

After a court trial, the court found the defendant's failure to list the property for sale breached the settlement agreement and awarded plaintiffs $2.5 million in contractual damages. The court reasoned the property would have sold, if listed, at an amount that would have entitled the tenant to $2.5 million in contractual damages. The court denied plaintiffs' request for prejudgment interest.

On appeal, defendant does not challenge the court's finding of breach or the amount of the court's award. Instead, it argues substantial evidence does not support causation, namely, that its breach caused the damages awarded by the court. Plaintiffs cross-appealed challenging the court's denial of prejudgment interest.

We reverse because no substantial evidence supports that defendant's breach of the settlement agreement caused plaintiffs damages. Plaintiffs' cross-appeal challenging the trial court's denial of prejudgment interest is thus moot and is dismissed.

## BACKGROUND

10979 Chalon, LLC (Chalon) owned a residence located at 10979 Chalon Road (the Property). Don Bolin is the sole member of 10979 Chalon LLC. In 2018, Vulcan Enterprises (Ignite

2

International Ltd.'s predecessor) rented the Property. The landlord-tenant relationship soured. Ultimately, Ignite International and Chalon settled their disputes arising from this relationship by entering a settlement agreement. Ignite International Ltd. is a wholly owned subsidiary of Ignite International Brands (collectively referred to as Ignite).

The trial court described the Property as "unique" and elaborated: "The residence is approximately 30,000 square feet. It has a garage that can hold over 20 cars. It has a driveway that can park 60 cars. It has five bars, a bowling alley, pool, pickle ball court, gym and other amenities. It has multiple floors with an elevator, and the first floor is set up for office space. The property provides virtually no privacy. Obviously, only a finite number of individuals or entities could afford to purchase the property. Even those that could afford to purchase the property, only a fraction would be interested in purchasing" it.

### 1. *The settlement agreement*

Don Bolin and Paul Bilzerian, Ignite's consultant, negotiated the settlement agreement, which is dated July 10, 2020. The settlement agreement recites that the rent plaintiffs paid under the residential lease was $200,000 per month. Chalon claimed, but Ignite disputed, that Ignite did not pay the rent due under the lease. Ignite claimed, but Chalon disputed, that Chalon "interfered with its rights under" an option to purchase the Property. To settle their disputes, the parties agreed Ignite would vacate the Property.

The settlement agreement further provided: "Chalon shall promptly list the Property for sale at a list price that Chalon alone shall determine. Chalon shall have absolute and total control and discretion over the sales process, including selecting

the listing agents and the sales price and, without exception, all other particulars of the sale."

The settlement agreement provided a descending ladder of payment to Ignite if the Property sold within the two-year period following the Property's listing: "In the event the Net Sales Proceeds received by Chalon exceed the sum of $55 million, Ignite will receive the first $5 million above $55 million, and Ignite shall thereafter receive 50 percent of all additional Net Sales Proceeds after . . . its payment of $5 million. In the event the Net Sale Proceeds received by Chalon are less than $55 million but greater than $50 million, Ignite and Chalon shall divide equally all amounts received that are between the $50 million and $55 million Net Sales Proceeds received. In the event the Net Sales Proceeds received by Chalon are $50 million or less, Ignite will receive $2.5 million, which is the lowest amount it will receive from a sale under any scenario. Net Sales Proceeds shall mean the gross sales price accepted by Chalon less the cost of broker's commissions, non-recurring closing costs and agreed upon buyer requested repairs."

If the Property did not sell within the above two-year period, the agreement provided: "Chalon will execute and deliver to Ignite a Promissory Note and second Deed of Trust for $2.5 million, at 3.5 % interest, the terms of which will require repayment on the sale of the Property."

The settlement agreement contains an attorney fee provision and provides, "This Agreement contains the entire agreement and understanding between the parties and supersedes all prior agreements and understandings, oral or written, concerning the matters covered by this Agreement."

4

## 2. *The complaint*

In April 2021 (approximately nine months after the parties entered into the settlement agreement), Ignite sued Chalon for breach of contract.

Ignite alleged, "While Defendant initially listed the Property for sale as required under the Settlement Agreement, for $67,500,000, the Defendant then took the Property off the market and instead rented the Property without disclosing such facts to Plaintiffs." "To date, Defendant has not relisted the Property despite advising Plaintiffs that the current tenant was originally to purchase the Property for over $70,000,000." Ignite further alleged, "Based on Defendant's breach of the Settlement Agreement" plaintiffs "have been damaged . . . ." Ignite requested prejudgment interest.

## 3. *Efforts to sell the Property after execution of the settlement agreement until trial*

We breakdown into sub-periods Chalon's efforts to sell the Property because they varied during the relevant time period and were the basis for the trial court's finding the Property would have sold absent breach.

### a. *July 17, 2020 to October 20, 2020*

On July 17, 2020 (seven days after the parties signed the settlement agreement), Bolin entered into a six-month listing agreement with real estate broker, Ginger Glass, and real estate agent, Arline Bolin (Bolin's sister), giving them exclusive right to sell the Property. The Property was listed on the Multiple

5

Listing Service (MLS) on July 24, 2020.[1]  In October 2020 (approximately three months after signing the listing agreement), Bolin terminated it before the six-month expiration date and removed the Property's listing from the MLS.

There was no evidence anyone offered to buy the Property during the three-month period Glass held the exclusive listing and the Property was listed on the MLS.  Glass showed the Property only "a couple" of times prior to the listing's cancellation.

### b. *October 2020 to January 2022*

In October 2020, Bolin leased the Property to ContextLogic, Inc. for $200,000 a month.  ContextLogic's lease included a "first right of refusal, " i.e., "a 'preemptive right to purchase property on the terms and conditions of an offer to purchase by a third person.' [Citation.]" (*Pellandini v. Valadao* (2003) 113 Cal.App.4th 1315, 1322.)  ContextLogic vacated the Property in January 2022.  ContextLogic did not offer to purchase the Property.

### c. *January 2022 to May 2022*

Between January 2022 and May 2022 Bolin listed the Property on the MLS.  There was no evidence anyone offered to purchase the Property during that time period.

---

[1]  According to Ignite's expert, Jason Fischman, MLS refers to a database for "shar[ing] information about properties available for sale.

6

**d.**    *May 2022 to August 2023*

The trial court found in May 2022, Bolin "again" removed the MLS listing and "at about the same time Chalon entered into a lease agreement with [D.W.]."[2] D.W.'s monthly rent was in excess of $200,000. D.W.'s lease included a first right of refusal. D.W. did not offer to buy the Property; instead, he left in August 2023.

**e.**    *August 2023 to March 2024*

On August 4, 2023 (three years after the settlement agreement), Bolin again listed the Property on the MLS. In March 2024, at the time of the trial, the Property had still not sold. There was no evidence of any offer to purchase the Property during this time period.

**4.    *Evidence at the court trial***

Bolin was Chalon's only witness.[3]

Bolin testified the settlement agreement did not require him to list the Property on the MLS, but acknowledged he told Paul Blizerian he would list the Property on MLS. Bolin testified that the kind of person who could afford to purchase the Property would prefer to purchase property off market rather than through a MLS listing.

Bolin told the court that at the time ContextLogic moved into the Property, its owner planned to buy the Property at a

---

[2] Bolin testified he listed the Property on the MLS on February 7, 2022; according to Ignite's counsel, Bolin removed the listing on May 11, 2022. Bolin testified D.W. leased the Property in October 2022.

[3] Ignite also called Bolin in their case-in-chief.

purchase price of over $70 million once ContextLogic stock became public. Bolin stated he had informed Ignite, "Context was originally going to purchase the property for over $70 million . . . ."[4] Bolin further testified that ultimately, ContextLogic did not purchase the Property because its "stock took a tumble." After that happened, ContextLogic could no longer afford the Property.

Bolin also testified D.W. "was going to buy the property," but he wanted to "test drive it first." Bolin and D.W. discussed a sale price of $60 million. Bolin stated D.W. did not buy the Property because he was diagnosed with cancer. Bolin's deposition testimony read at trial indicated D.W. had 90 days to vacate the Property if another buyer purchased it.

Bolin explained the best way to sell the Property was first to rent it to prospective buyers. Although both renters, ContextLogic and D.W., initially expressed an interest in purchasing the Property, they never did. Bolin testified he canceled the agreement with broker Glass in October 2020 because he thought he "had the house sold" to ContextLogic.

Bolin also testified when the Property was not listed on the MLS, he received a $40-million offer to purchase the Property. Bolin did not indicate who made this offer or when this occurred. The $40-million offer consisted of $8 million in up-front payment and $32 million to be carried by Bolin. Bolin did not accept the offer "[b]ecause [he] could not satisfy [his] loan at the bank" and he did not want to breach his loan conditions.

---

[4] Ignite's counsel offered Bolin's deposition testimony in which Bolin stated the owner of Context Logic "had just bought a $10 million home around the corner for his parent's . . . and I really figured this was the best . . . bet at having a buyer."

8

Bolin explained other homes of similar "magnitude" have been on the market for several years. Bolin told the court that his sister had been his listing agent ever since Ignite left the Property. When asked if he signed an agreement with his sister, Bolin stated he had, but could "not recollect" when he did so. After cancelling the agreement with Glass, Bolin did not hire another real estate broker to sell the Property.

Jason Fischman, Ignite's expert, testified he was a chief valuation officer at Appraisal Evaluations. His specialty was "high value and ultra high value residences throughout the Los Angeles area." Fischman estimated that on September 15, 2022 (two years two months after the parties signed the settlement agreement), the Property was worth $63 million. To arrive at this appraisal, Fischman compared the Property to 11 other properties that sold between October 2019 and March 2023, one of which sold to a tenant, at least four had sold "off market" and one "had been on and off the market for a long period of time." Fischman testified "off market" means that the Property was not listed on the MLS. Fischman stated the Property that had been "on and off the market" was taken off the market because it "suffered from market fatigue." Fischman acknowledged that a house may not sell for the appraised value.

Fischman also testified the Property was listed on the MLS on July 24, 2020 and remained on that site for approximately 90 days at an asking price of $67.5 million. Fischman further testified that in February 2022, the Property was listed for sale at an asking price of $68.5 million. With respect to marketing an ultra high value residence, Fischman acknowledged, "[T]he highest price sale that I personally brokered was a million, five,

9

so I can't speak to the marketing efforts or strategies that are utilized to market a property of this caliber."

Ignite's chief executive officer, Scott Rohleder, also testified. Rohleder stated after entering the settlement agreement, Chalon did not continuously list the Property on the MLS. Rohleder said (and it is undisputed) that Ignite complied with the terms of the settlement agreement. Rohleder told the court that prior to trial, Chalon had offered Ignite a deed of trust, and Ignite did not accept it.

Dan Blizerian lived in the Property when Ignite rented it. Blizerian testified Bolin told him he could not sell the Property while Dan Blizerian lived there. Dan Blizerian "was extremely pissed off" because Bolin asked him to move out and then rented the Property to a different tenant.

## 5. *The parties' arguments below*

The court asked Ignite's counsel, "[W]hy are we here?", and Ignite's counsel responded, "We are here because he [Bolin] didn't list the property, Your Honor. It was bad faith." Ignite's Counsel requested $6.5 million judgment based on a projected $63 million sale of the Property.

Ignite's counsel contended that pursuant to the settlement agreement, "the defendant had a duty to list the property for sale on the MLS." Counsel argued it was undisputed Bolin cancelled the listing after three months. Counsel further argued when Bolin did not list the Property on the MLS, he rented the Property to ContextLogic and D.W. Counsel told the court, "[T]here is no dispute the property has not been sold to this day. But, it also hasn't been listed continuously to this day as required." Counsel claimed Bolin breached his duty "by not listing the property on the MLS." Counsel faulted Bolin for

10

renting the Property: "A lot of people when they look for a home to move into do not want a house that already has a renter."

With respect to damages, Ignite's counsel argued the value of the Property, $63 million, was undisputed. Counsel further contended Fischman's testimony showed damages were not speculative. "Based on the sales price of $63 million that Mr. Fischman testified to relating to the value of the property during the relevant period, based on a physical analysis, locational analysis, economic analysis, most importantly, in accordance with the Uniform Standards of Professional Appraisals, the property has a market value of $63 million." Based on a $63-million sale price, Ignite was entitled to $6.5 million in damages.

Chalon's counsel argued the settlement agreement did not require listing on the MLS and Bolin took numerous steps to try to sell the Property. According to counsel, " 'listed' simply means put it out there, up for sale." Counsel explained Bolin rented the Property in the hope that it would lead to a sale. Counsel told the court, "[T]he only evidence the Court has seen is that renting the property was in my client's furtherance of his goal of selling the property." Counsel contended there was no evidence that had the Property been listed on the MLS, it would have sold, let alone sold for $63 million. Counsel emphasized that plaintiffs "did not claim in this trial that there would have been a sale but for Mr. Bolin's actions."

In rebuttal, Ignite's counsel stated Bolin promised to list the Property on the MLS. Counsel argued the breach occurred when Bolin removed the Property from the MLS on October 30, 2020.

**6.** *Final statement of decision*

With respect to breach, the trial court found Chalon promised to list the Property on the MLS and "materially breached the settlement agreement when it removed the property from the MLS." The court explained: "After October 2020, Chalon has not made a good faith effort to market the property for sale. Since October 2020, Chalon has not entered into any contract with any realtor to market and sell the property. Bolin's sister may be a real estate agent, but Chalon provides no evidence that Bolin's sister was under contract to market or sell the property after October 2020. . . . Since Chalon removed the property from the MLS whenever it was rented, it appears that Chalon preferred the property to be rented instead of sold. Chalon does have a website for the property, but merely having a website does not establish a good faith attempt to sell the property." "After October 2020, Chalon has not made a good faith effort to market the property for sale."

With respect to damages, the trial court rejected damages based on the $63 million appraisal: "While the property has an appraised value of $63,000,000, the court finds that due to the characteristics of the property, it will be difficult to obtain a buyer to purchase the property at the appraised price. Neither Ignite nor Chalon have provided any evidence that a prospective buyer was interested in purchasing the property for $63,000,000. At trial, Chalon, through Bolin, expressed a willingness to sell the property at $55,000,000, but Chalon has never listed the property below $65,000,000. Chalon acknowledged that after the settlement agreement was signed, it received a $40,000,000 offer to purchase the property, where the buyer would put $8,000,000 down and Chalon would carry the remaining $32,000,000.

12

Chalon claims that this offer was rejected because Chalon had a bank loan of $15,000,000.  By the terms of the settlement agreement, Chalon and Ignite acknowledge that the property may sell for under $50,000,000."  "The court finds that the property would not have been sold during the relevant time period for the appraised value of $63,000,000."

With respect to causation, initially, the court found in its tentative statement of decision:  "Chalon acknowledged that after the settlement agreement was signed, it received a $40,000,000 offer to purchase the property, but Chalon felt the offer was too low."  Chalon objected to this tentative finding because the purported $40 million offer was really for $8 million and required Bolin to carry the remaining $32 million.  In its final statement of decision, the trial court eschewed relying on the latter $40 million offer.  Instead, it relied on the Property's rental history to find: "[T]he property would have been sold during the relevant time period for at least $40,000,000 if Chalon had not breached the contract with Ignite and had properly marketed and listed the property for sale.  For a significant part of the relevant time period, people and/or entities were interested in residing on the property, and these persons and/or entities were willing to pay over $200,000 a month in rent to reside on the property.  This is further evidence that people and/or entities had an interest in the property and that the property could have been sold during the relevant time if the property was properly marketed and listed."

The court awarded Ignite $2.5 million in damages.

### 7.   *Judgment*

The judgment dated April 11, 2024 and the amended judgment dated January 21, 2025, require Chalon pay Ignite

13

$2.5 million and awards Ignite no prejudgment interest.[5]  The amended judgment requires Chalon pay Ignite's attorney fees in the amount of $206,104.90 and costs in the amount $35,103.84. Chalon appealed and Ignite cross-appealed from the judgment.

## DISCUSSION

### A.    There Was No Substantial Evidence the Property Would Have Sold Absent Chalon's Breach of the Settlement Agreement

"An essential element of a claim for breach of contract are [*sic*] damages resulting from the breach.  [Citation.]  Causation of damages in contract cases requires that the damages be proximately caused by the defendant's breach." (*St. Paul Fire & Marine Ins. Co. v. American Dynasty Surplus Lines Ins. Co.* (2002) 101 Cal.App.4th 1038, 1060.)  "A proximate cause of loss or damage is something that is a substantial factor in bringing about that loss or damage.  [Citations.]  The term 'substantial factor' has no precise definition, but 'it seems to be something which is more than a slight, trivial, negligible, or theoretical factor in producing a particular result.' [Citation.]" (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 909.)

_____

[5] The parties appear to agree that the trial court amended the judgment to add attorney fees and costs.  We deem Chalon's appeal a premature appeal from the amended judgment. (Cf. *Mukthar v. Latin American Security Service* (2006) 139 Cal.App.4th 284, 288 [deeming appeal from pre-judgment order to be premature appeal from judgment].)  The result is the same whether the appeal is from the judgment or the amended judgment.

14

On appeal, Chalon argues no substantial evidence supports a finding that "had the Property been marketed properly, it would have sold, for any price."  Ignite counters by citing the trial court's finding "that for a significant part of the relevant time period, people and/or entities were interested in residing on the Property, and that the Property could have been sold during the relevant time if the Property was properly marketed and listed."  Ignite further argues that damages may be difficult to prove does not bar recovery because Chalon's breach caused any such difficulty.  Ignite emphasizes the trial court awarded only the minimum in contractual damages in the event of a sale within the contractual two-year period.

In reviewing a substantial evidence challenge, we consider the evidence in the light most favorable to the prevailing party; we may not reweigh the evidence.  (*Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1026.)  Even under this deferential standard of review, we conclude no substantial evidence linked Ignite's theory of breach with its theory of causation.

Ignite argues Chalon's breach—"terminat[ing] the listing agreement with real estate broker Ginger Glass and real estate agent Arline Bolin and remov[ing] the Property from the MLS in October 2020"—caused the Property not to sell within the contractual two-year period.  There was no evidence at trial to support this contention.

The record contains no evidence that a MLS listing helps sell ultra high value properties in general, or that a MLS listing would have produced a sale of the ultra high value and "unique" property that is the subject of this appeal.  The record similarly contains no evidence that exclusive broker listings assist in selling high value properties, and no evidence that such a broker

15

listing would have produced a sale of the Property itself. The record contains no evidence of an offer to purchase the Property during the time period the Property was listed on the MLS and no evidence of an offer during the time period Glass had an exclusive listing to sell the Property. Ignite's expert did not opine on the likelihood the Property would have sold had it been listed on the MLS or had Bolin not canceled the Glass listing agreement. Indeed, Fischman admitted he could not "speak to the marketing efforts or strategies that are utilized to market a property of this caliber."

Bolin's testimony was undisputed that homes of the Property's "magnitude" may take several years to sell. Bolin testified that the only offer he did receive, which included Bolin lending the purported buyer 75% of the purchase price, occurred when the Property was *not* listed on the MLS. This too was undisputed. Although the trial court did not have to credit Bolin's testimony, Ignite offered no evidence supporting an inference that had the Property been listed on the MLS continuously and had Bolin continued listing with a real estate broker, the Property would have sold within two years of the execution of the settlement agreement.

Ignite points out ContextLogic and D.W. were interested in residing in the Property; after all, they paid at least $200,000 in monthly rent. Notwithstanding ContextLogic's and D.W.'s initial interests in purchasing the Property, neither offered to purchase it. Without any supporting expert testimony, the existence of a rental market does not support the inference that listing the Property on the MLS or through an exclusive broker arrangement would have generated a sale of the Property within the contractual two year period.

16

Ignite's appellate argument that ContextLogic's and D.W.'s interest in renting the Property proves the Property would have sold had Chalon not delisted the Property also conflicts with Ignite's theory of causation at trial. Ignite's trial position was that Bolin should *not* have leased the Property, but instead, kept it empty and listed it on the MLS. To support that theory of causation, Ignite's counsel reminded the trial court argued that three months after listing the Property, "Defendant took the property off the market . . . and rented it instead and did not list it again until January 2022, well after the filing of this lawsuit in April of 2021." Ignite's appellate contention the Property's rental history during the relevant two-year period proves the Property would have sold during that same period thus undermines its only causation theory at trial, to wit, that the Property would have sold had Chalon left the Property empty and listed it on the MLS and with broker Glass.

Ignite's remaining arguments do not support affirmance. Ignite contends a breach of contract claim is not deficient where the asserted contractual breach caused difficulty in proving the amount of damages. That argument is beside the point. Here, the amount of damages was not difficult to determine. The settlement agreement specifies a descending ladder of payment to Ignite in the event the Property sold. Chalon does not dispute that if there were evidence the Property would have sold for $40 million during the relevant time period, then Ignite would be entitled to $2.5 million in damages. Instead, Chalon challenges the sufficiency of the evidence to support the trial court's finding of causation, to repeat, that absent breach, the Property would

have sold for $40 million. As explained above, we conclude there was insubstantial evidence to support that theory of causation.[6]

## B. Ignite's Cross-Appeal Seeking Prejudgment Interest Is Moot

In its cross-appeal, Ignite argues the trial court erred in not awarding it prejudgment interest. This argument depends on the validity of the judgment. Because we reverse the judgment, Ignite's cross-appeal is moot.

## DISPOSITION

The judgment is reversed. The cross-appeal is dismissed. 10979 Chalon, LLC shall recover its costs on appeal.
NOT TO BE PUBLISHED.

BENDIX, J.

We concur:

ROTHSCHILD, P. J.                M. KIM, J.

---

[6] No party has asked us to address were we to reverse, whether the settlement agreement would provide Ignite a $2.5 million promissory note and second deed of trust against the Property. In the trial court, Ignite's counsel represented the promissory note was not at issue. The trial court then stated, "I plan on making no findings based on the promissory note." We similarly do not opine on that issue.